## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| ———————————————— | |
| FTX TRADING LTD., WEST REALM SHIRES SERVICES, INC. and ALAMEDA RESEARCH LTD., | |
| Plaintiffs, | |
| - against - | |
| MIRANA CORP., BYBIT FINTECH LTD., TIME RESEARCH LTD., SIN WEI "SEAN" TAN, WEI LIN "GERMAINE" TAN, WEIZHENG YE, and NASHON LOO SHUN LIANG, | Adv. Pro. No. 23-50759 (JTD) |
| Defendants. | |
| ———————————————— | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' COMPLAINT

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

## TABLE OF CONTENTS

*Page*

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 5

LEGAL STANDARD .......................................................................................... 8

ARGUMENT .................................................................................................... 11

I.    THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS, OR, IN THE ALTERNATIVE, PLAINTIFFS SHOULD BE GRANTED JURISDICTIONAL DISCOVERY ......................................................................... 11

    A. Mirana's and Bybit's Post-Petition Actions Render Them Subject to the Jurisdiction of This Court ................................................................................. 13

    B. Defendants' Contacts With the United States Otherwise Give Rise to Personal Jurisdiction ................................................................................. 15

    C. Defendants Have Sufficient Minimum Contacts With the United States Such That Exercising Personal Jurisdiction Over Them Will Not Offend Due Process. ............ 19

    D. Should the Court Find That Plaintiffs Have Not Made a *Prima Facie* Showing of Personal Jurisdiction, Plaintiffs Are Entitled to Jurisdictional Discovery ................. 21

II.   PLAINTIFFS HAVE AN ENFORCEABLE INTEREST IN THE FUNDS THEY SEEK TO RECOVER ......................................................................... 24

    A. The Law Is Clear That Plaintiffs Have Title to the Transferred Assets ..................... 25

    B. Defendants' Reference to Extrinsic Documents Does Not Warrant Dismissal .......... 26

III.  SECTIONS 542, 547 AND 548 OF THE BANKRUTPCY CODE APPLY EXTRATERRITORIALLY ......................................................................... 30

IV.  THE COMPLAINT ADEQUATELY PLEADS FRAUDULENT TRANSFERS UNDER FEDERAL AND STATE LAW ......................................................................... 33

    A. The Complaint Directly Alleges Actual Fraudulent Intent, Rendering "Badges of Fraud" Unnecessary ................................................................................. 35

    B. The Complaint Also Alleges "Badges of Fraud" That Support an Inference of Fraudulent Intent ................................................................................. 38

V.   THE COMPLAINT PROPERLY PLEADS A TURNOVER CLAIM. ......................... 41

    A. Plaintiffs Have Adequately Pled a Claim for Turnover ............................................. 41

    B. Bybit's Reference to an Alleged Extraneous "Terms of Service" Does Not Warrant Dismissal at This Stage ................................................................................. 47

    C. Bybit's Joinder Argument Is Procedurally Improper and Bybit Does Not Carry Its Burden To Dismiss for Failure To Join a Party ...................................................... 52

VI.  DEFENDANTS HAVE VIOLATED THE AUTOMATIC STAY BY FREEZING AND ATTEMPTING TO DEVALUE ESTATE ASSETS ......................................................... 53

A. Plaintiffs Have Adequately Alleged a Violation of the Automatic Stay With Regard to Bybit's Refusal To Process Withdrawals of Estate Assets ........................................ 54

B. Plaintiffs Have Adequately Alleged a Violation of the Automatic Stay With Regard to Mirana's and Bybit's Attempts To Devalue the Debtors' BIT Tokens. ..................... 56

**VII. THE COMPLAINT ADEQUATELY PLEADS PROPERTY RECOVERY AND DISALLOWANCE OF CLAIMS.** .................................................................................... **57**

**CONCLUSION** ..................................................................................................................... **58**

## <u>TABLE OF AUTHORITIES</u>

<u>***Page(s)***</u>

**Cases**

*In re 1031 Tax Grp., LLC,*
    420 B.R. 178 (Bankr. S.D.N.Y. 2009) ......................................................................44

*In re 45 John Lofts, LLC,*
    650 B.R. 602 (Bankr. S.D.N.Y. 2023) ......................................................................39

*Abitron Austria GmbH* v. *Hetronic Int'l, Inc.,*
    600 U.S. 412 (2023) ...................................................................................................30

*Allegaert* v. *Perot,*
    548 F.2d 432 (2d Cir. 1977) ......................................................................................48

*Am. Eagle Outfitters, Inc.* v. *Lyle & Scott Ltd.,*
    2007 U.S. Dist. LEXIS 30074 (W.D. Pa. Apr. 12, 2007) ...........................43, 49, 56

*In re Am. Home Mortg. Holding,*
    458 B.R. 161 (Bankr. D. Del. 2011) ..........................................................................41

*In re Amdura Corp.,*
    75 F.3d 1447 (10th Cir. 1996) ...................................................................................25

*In re APF Co.,*
    264 B.R. 344 (Bankr. D. Del. 2001) ..............................................................47, 48, 50

*In re APF Co.,*
    Nos. 98-1596, 00-854, 2001 WL 1820788 (D. Del. Aug. 31, 2001) .........................44

*Asahi Metal Indus. Co.* v. *Superior Ct.,*
    480 U.S. 102 (1987) ...................................................................................................21

*Ashcroft* v. *Iqbal,*
    556 U.S. 662 (2000) ...................................................................................................10

*In re AstroPower Liquidating Tr.,*
    335 B.R. 309 (Bankr. D. Del. 2005) ..........................................................................48

*BCS Bus. Consulting Servs. PTE. Ltd.* v. *Baker,*
    2023 U.S. Dist. LEXIS 156573 (C.D. Cal. Sept. 5, 2023) ........................................20

*Begier* v. *I.R.S.,*
    496 U.S. 53 (1990) .....................................................................................................32

*In re Bernard L. Madoff Inv. Sec. LLC*,
    440 B.R. 274 (Bankr. S.D.N.Y. 2010) .....................................................................19

*In re Bernard L. Madoff Inv. Secs. LLC*,
    2012 WL 2254995 (Bankr. S.D.N.Y. June 15, 2012) ........................................22, 23

*Black* v. *Montgomery Cty.*,
    835 F.3d 358 (3d Cir. 2016) ............................................................................10, 43

*Boyle* v. *City of Phil.*,
    2018 WL 994218 (E.D. Pa. Feb. 20, 2018) ...........................................................11

*Burger King Corp.* v. *Rudzewicz*,
    471 U.S. 462 (1985) ..................................................................................... *passim*

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) .......................................................................3, 11

*Calder* v. *Jones*,
    465 U.S. 783 (1984) ...........................................................................12, 13, 15

*In re Celsius Network LLC*,
    2022 WL 17541051 (Bankr. S.D.N.Y. Dec. 8, 2022) ........................................45, 46

*In re Chocolate Confectionary Antitrust Litig.*,
    602 F. Supp. 2d 538 (M.D. Pa. 2009) ..........................................................1, 21, 22

*City of Chicago* v. *Fulton*,
    592 U.S. 154 (2021) .........................................................................................53

*In re Com. Fin. Servs., Inc.*,
    322 B.R. 440 (Bankr. N.D. Okla. 2003) ..............................................................57

*In re Culp*,
    588 B.R. 389 (Bankr. D. Del. 2018) ...................................................................42

*In re Daya Meds., Inc.*,
    560 B.R. 855 (Bankr. S.D. Fla., 2016) ...........................................................54, 57

*In re DBSI, Inc.*,
    447 B.R. 243 (Bankr. D. Del. 2011) ...................................................................40

*In re DBSI, Inc.*,
    451 B.R. 373 (Bankr. D. Del. 2011) ...................................................................20

*In re DBSI, Inc.*,
    467 B.R. 309 (Bankr. D. Del. 2012) ...................................................................19

*Derbin* v. *Biocompatibles Intl. PLC*,
  1998 WL 551976 (E.D. Pa. Aug. 11, 1998) ...................................................14

*In re Digital Networks N. Am., Inc.*,
  2018 WL 3869599 (Bankr. D. Del. Aug. 13, 2018) .......................................44, 45

*In re Direct Access Partners, LLC*,
  602 B.R. 495 (Bankr. S.D.N.Y., 2019) .........................................................38

*Disabled in Action of Pa.* v. *Se. Pa. Transp. Auth.*,
  635 F.3d 87 (3d Cir. 2011) ..........................................................................52

*In re Dordevic*,
  67 F.4th 372 (7th Cir. 2023) ........................................................................42

*Drivetrain, LLC* v. *X. Com., Inc.*,
  No. 22-50448, Adv. No. 22-50448, 2023 WL 1804627 ............................34, 35, 36

*In re DVI, Inc.*,
  2008 WL 4239120 (Bankr. D. Del. Sept. 16, 2008) ........................................11

*In re Enron Corp.*,
  328 B.R. 58 (Bankr. S.D.N.Y. 2005) .............................................................34

*In re EPD Inv. Co., LLC*,
  821 F.3d 1146 (9th Cir. 2016) ................................................................48, 50

*In re EXDS, Inc.*,
  316 B.R. 817 (Bankr. D. Del. 2004) ...............................................................48

*Re Extraction Oil & Gas, Inc.*,
  2020 WL 7074142 (Bankr. D. Del. Dec. 3, 2020) ............................................53

*In re FAH Liquidating Corp.*,
  572 B.R. 117 (Bankr. D. Del. 2017) ......................................................3, 31, 33

*Farmers Ins. Exch.* v. *Portage La Prairie Mut. Ins. Co.*,
  907 F.2d 911 (9th Cir. 1990) ........................................................................14

*In re FBI Wind Down, Inc.*,
  581 B.R. 387 (Bankr. D. Del. 2018) .........................................................24, 25

*In re Fedders N. Am., Inc.*,
  405 B.R. 527 (Bankr. D. Del. 2009) ...............................................................34

*Finjan LLC* v. *Trustwave Holdings, Inc.*,
  2021 WL 5051147 (D. Del. Oct. 29, 2021) .......................................................8

*In re French*,
    440 F.3d 145 (4th Cir. 2006) ....................................................................30, 31, 33

*In re Fruehauf Trailer Corp.*,
    444 F.3d 203 (3d Cir. 2006)...............................................................................41

*Global Network Commc'ns, Inc.* v. *City of N.Y.*,
    458 F.3d 150 (2d Cir. 2006)..........................................................................11, 45

*Godo Kaisha IP Bridge 1* v. *TCL Commun. Tech. Holdings Ltd.*,
    2016 WL 4413140 (D. Del. Aug. 17, 2016) ......................................................22

*Hanson* v. *Denckla*,
    357 U.S. 235 (1958).......................................................................................10, 13

*Hays & Co.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    885 F.2d 1149 (3d Cir. 1989)..........................................................................4, 48

*Heinzl* v. *Quality Foods Corp.*,
    2014 WL 6453894 (W.D. Pa. Nov. 17, 2014) ...................................................52

*Horton* v. *FedChoice Fed. Credit Union*,
    688 F. App'x 153 (3d Cir. 2017) .......................................................................51

*Hubbard* v. *Rite Aid Corp.*,
    433 F.Supp.2d 1150 (S.D. Cal. 2006)..............................................................4, 53

*Integrated Sols., Inc.* v. *Serv. Support Specialties, Inc.*,
    124 F.3d 487 (3d Cir. 1997)...............................................................................41

*International Shoe Co.* v. *Washington*,
    326 U.S. 310 (1945)...........................................................................................10

*Janney Montgomery Scott, Inc.* v. *Shepard Niles, Inc.*,
    11 F.3d 399 (3d Cir. 1993)................................................................................52

*In re Johnson*,
    548 B.R. 770 (Bankr. S.D. Ohio, 2016).......................................................54, 57

*Kinetic Instruments, Inc.* v. *Lares*,
    802 F. Supp. 976 (S.D.N.Y. 1992) ....................................................................23

*In re Klarchek*,
    508 B.R. 386 (Bankr. N.D. Ill. 2014) ................................................................56

*In re Lexington Healthcare Grp., Inc.*,
    363 B.R. 713 (Bankr. D. Del. 2007) ..................................................................44

*In re Live Well Financial Inc.*,
    652 B.R. 699 (Bankr. D. Del. 2023) ..................................................34, 37, 38

*In re Lyondell Chem. Co.*,
    543 B.R. 127 (Bankr. S.D.N.Y. 2016) ...............................................32, 33

*In re Mallinckrodt PLC*,
    2024 WL 206682 (Bankr. D. Del. Jan. 18, 2024) ...........................40, 57

*Maritime Elec. Co., Inc.* v. *United Jersey Bank*,
    959 F.2d 1194 (3d Cir. 1991)...................................................................54

*In re Maxus Energy Corp.*,
    641 B.R. 467 (Bankr. D. Del. 2022) ................................................3, 31

*McGee* v. *Int'l Life Ins. Co.*,
    355 U.S. 220 (1957).............................................................................10, 13

*In re Meadows*,
    396 B.R. 485 (B.A.P. 6th Cir. 2008).......................................................25

*Mellon Bank PSFS, Nat'l Ass'n* v. *Farino*,
    960 F.2d 1217 (3d Cir. 1992)...................................................................9

*Metcalfe* v. *Renaissance Marine, Inc.*,
    566 F.3d 324 (3d Cir. 2009)..........................................................2, 8, 21

*In re Millennium Lab Holdings II, LLC*,
    2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019) ....................27, 33, 37

*Miller* v. *Mott*,
    2023 WL 6467368 (Bankr. D. Del. Oct. 4, 2023) ...........................43, 57

*Miller Yacht Sales, Inc.* v. *Smith*,
    384 F.3d 93 (3d Cir. 2004)......................................................................8

*In re Mintze*,
    434 F.3d 222 (3d Cir. 2006).............................................................49, 50

*Moon* v. *Breathless, Inc.*,
    2015 WL 7720490 (D.N.J. Nov. 30, 2015) ....................................4, 51

*Morrison* v. *Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010).................................................................................31

*In re Nortel Networks Inc.*,
    545 B.R. 469 (Bankr. D. Del. 2016) ......................................................45

*In re Oakwood Homes Corp.*,
    342 B.R. 59 (Bankr. D. Del. 2006) ...................................................................46

*In re Oakwood Homes Corp.*,
    2005 WL 670310 (Bankr. D. Del. Mar. 18, 2005) .....................................................48

*In re OPP Liquidating Co.*,
    2022 Bankr. LEXIS 651 (Bankr. D. Del. Mar. 14, 2022) ........................................5, 56

*In re Patriot National Inc.*,
    592 B.R. 560 (Bankr. D. Del., 2018) ..................................................................55

*In re PennySaver USA Publ'g, LLC*,
    602 B.R. 256 (Bankr. D. Del. 2019) ................................................................39, 40

*Philip A. Templeton, M.D., P.A.* v. *EmCare, Inc.*,
    868 F. Supp. 2d 333 (D. Del. June 15, 2012) .....................................................11, 25

*Pinnavaia* v. *Colotex Asbestos Settlement Tr.*,
    271 F. Supp. 3d 705 (D. Del. 2017) ................................................................25, 26

*Pittsburgh Logistics Sys., Inc.* v. *C.R. England, Inc.*,
    669 F.Supp.2d 613 (W.D. Pa. 2009) ..................................................................52

*In re Prudential Lines Inc.*,
    928 F.2d 565 (2d Cir. 1991) ............................................................................56

*In re Pursuit Capital Mgmt., LLC*,
    595 B.R. 631 (Bankr. D. Del. 2018) ...........................................................9, 48, 50

*Registered Agents, Ltd.* v. *Registered Agent, Inc.*,
    880 F. Supp. 2d 541 (D. Del. 2012) ...................................................................21

*Renner* v. *Lanard Toys*,
    33 F.3d 277 (3d Cir. 1994) ........................................................................2, 21, 24

*Roe* v. *Diamond*,
    519 F. App'x 752 (3d Cir. 2013) .......................................................................34

*Sanitec Indus., Inc.* v. *Sanitec Worldwide, Ltd.*,
    376 F. Supp. 2d 571 (D. Del. 2005) ....................................................................9

*Schmidt* v. *Skolas*,
    770 F.3d 241 (3d Cir. 2014) ............................................................................45

*In re Schwartz*,
    2014 WL 2621114 (Bankr. D.N.J. June 12, 2014) .................................................42

*Seaport Inlet Marina, LLC* v. *Connell*,
   2017 WL 3981128 (D.N.J. Sept. 11, 2017) ........................................................46

*Sec. Investor Prot. SIPA Liquidation Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*,
   480 B.R. 501 (Bankr. S.D.N.Y. 2012) .............................................................32

*In re Sentinel Mgmt. Grp., Inc.*,
   728 F.3d 660 (7th Cir. 2013) .........................................................................34

*Sharp International Corp.* v. *State Street Bank & Trust Co.*,
   403 F.3d 43 (2d Cir. 2005)............................................................................37

*In re Simon*,
   153 F.3d 991 (9th Cir. 1998) .........................................................................33

*In re Southmark Corp.*,
   49 F.3d 1111 (5th Cir. 1995) .........................................................................25

*Stratagem Dev. Corp.* v. *Heron Int'l N.V.*,
   153 F.R.D. 535 (S.D.N.Y. 1999) ....................................................................23

*In re Student Fin. Corp.*,
   335 B.R. 539 (D. Del. 2005)..........................................................................11

*In re Syntax-Brillian Corp.*,
   2016 WL 1165634 (Bankr. D. Del. Feb. 8, 2016) .....................................33, 35, 38

*In re Tandycrafts, Inc.*,
   317 B.R. 287 (Bankr. D. Del. 2004) ..................................................................9

*Tedeschi* v. *D.N. Desimone Constr., Inc*,
   2016 U.S. Dist. LEXIS 102209 (D.N.J. Aug. 4, 2016)..........................................51

*In re Thgh Liquidating LLC*,
   2020 WL 5409002 (D. Del. Sept. 9, 2020) ................................................5, 53, 55

*Toys "R" Us, Inc.* v. *Step Two, S.A.*,
   318 F.3d 446 (3d Cir. 2003)......................................................................8, 22

*In re Trans World Airlines*,
   2003 WL 21087970 (Bankr. D. Del. May 6, 2003)...............................................21

*In re Tribune Co.*,
   464 B.R. 126 (Banrk. D. Del., 2011) ................................................................38

*Tristrata Tech., Inc.* v. *Emulgen Labs., Inc.*,
   537 F. Supp. 2d 635 (D. Del. 2008)..................................................................20

*Tsai* v. *Calloway*,
  2023 WL 6317742 (D. Del. Sept. 28, 2023) ................................................. 3, 27

*Uebler* v. *Boss Media, AB*,
  363 F. Supp. 2d 499 (E.D.N.Y. 2005) ............................................................ 21

*In re Uni-Marts, LLC*,
  405 B.R. 113 (Bankr. D. Del. 2009) ................................................................ 9

*United States* v. *Whiting Pools, Inc.*,
  462 U.S. 198 (1983) ........................................................................................ 41

*In re USA Diversified Prods., Inc.*,
  100 F.3d 53 (7th Cir. 1996) ............................................................................ 25

*Va. College, LLC* v. *Martin*,
  2012 U.S. Dist. LEXIS 96425 (S.D. Miss. July 12, 2012) ............................ 52

*In re Veluchamy*,
  879 F.3d 808 (7th Cir. 2018) .......................................................................... 42

*World-Wide Volkswagen Corp.* v. *Woodson*,
  444 U.S. 286 (1980) ........................................................................ 10, 11, 19

**Statutes**

11 U.S.C. § 362(a)(3) ........................................................................ 53, 56, 57

11 U.S.C. §§ 541(a) & (a)(3) ........................................................... 31, 41, 33

11 U.S.C. § 542 ....................................................................................... *passim*

11 U.S.C. §§ 547 & 548 ............................................................... 3, 30, 31, 32

11 U.S.C. § 550 .............................................................................. 31, 32, 57

**Other Authorities**

Fed. R. Bankr. P. 7004 ...................................................................................... 9

Fed. R. Bankr. P. 7018 .................................................................................... 57

Fed. R. Civ. P. 9(b) ......................................................................................... 34

Fed. R. Civ. P. 12(b)(2) ................................................................................... 51

Fed. R. Civ. P. 12(b)(6) ...................................................................... 10, 11, 44

Fed. R. Civ. P. 12(b)(6) .................................................................... 4, 51, 52

Fed. R. Civ. P. 18 ........................................................................................................................57

Fed. R. Civ. P. 19 .............................................................................................................51, 52, 53

## GLOSSARY

| | |
|---|---|
| **Alameda** | Alameda Research Ltd., a "crypto hedge fund" operated by the FTX Group, as well as other FTX Group affiliates. |
| **Behmke Decl.** | *Declaration of Peter Behmke in Support of Defendant Nashon Loo Shun Liang, Sin Wei "Sean" Tan, Wei Lin "Germaine" Tan, and Weizheng Ye's Motion to Dismiss the Complaint* [Adv. D.I. 47]. |
| **Bybit Br.** | *Brief in Support of Defendant Bybit Fintech Ltd.'s Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim* [Adv. D.I. 35]. |
| **Chapter 11 Cases** | The jointly administered Chapter 11 cases filed by FTX Trading Ltd. and its affiliated entities pending before the United States Bankruptcy Court for the District of Delaware under lead Case No. 22-11068. |
| **Chen Decl.** | *Declaration of Weisheng Chen in Support of Mirana Corp.'s Motion to Dismiss the Plaintiff's Complaint* [Adv. D.I. 41]. |
| **Complaint** | The complaint filed in the above-captioned action on November 10, 2023 [Adv. D.I. 1]. |
| **Daucher Decl.** | *Declaration of Eric Daucher in Support of Mirana Corp.'s Motion to Dismiss the Plaintiff's Complaint* [Adv. D.I. 40]. |
| **Debtors** | The above-captioned debtors and debtors-in-possession. |
| **Defendants** | Mirana Corp., Bybit Fintech Ltd., Time Research, Ltd., Sin Wei "Sean" Tan, Wei Lin "Germaine" Tan, Weizheng Ye, and Nashon Loo Shun Liang.. |
| **Disclosure Statement** | *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Affiliated Debtors and Debtors-in-Possession*, filed December 16, 2023 [D.I. 4862]. |
| **First Day Declaration** | *Declaration of John J. Ray in Support of Chapter 11 Petitions and First Day Pleadings*, filed November 17, 2022 [D.I. 24]. |
| **First Ray Report** | *First Interim Report of John J. Ray III to the Independent Directors*, filed April 9, 2023 [D.I. 1242-1]. |
| **FTX Exchange(s)** | The FTX.com Exchange and/or FTX US Exchange, as defined below. |

| | |
|---|---|
| **FTX Group** | The collection of four silos of Debtor and non-Debtor entities described in footnote 2 of the Complaint. |
| **FTX Insiders** | (1) Samuel Bankman-Fried, co-founder of, *inter alia*, Plaintiff FTX Trading Ltd.; (2) Caroline Ellison, former co-CEO of Alameda; (3) Nishad Singh, former director of engineering of, *inter alia*, Debtor FTX Trading Ltd.; and (4) Zixiao "Gary" Wang, co-founder and former chief technology officer of, *inter alia*, Debtor FTX Trading Ltd. |
| **FTX.com** | Plaintiff FTX Trading Ltd. |
| **FTX.com Exchange** | The exchange operated by FTX Trading Ltd. |
| **FTX US** | Plaintiff West Realm Shires Services, Inc. |
| **FTX US Exchange** | The exchange operated by West Realm Shires Services, Inc. |
| **Haizhou Decl.** | *Declaration of Fang Haizhou, CEO, in Support of Time Research Ltd.'s Motion to Dismiss Complaint* [Adv. D.I. 33]. |
| **Individual Defs. Br.** | *Memorandum of Law of Defendants Nashon Loo Shun Liang, Sin Wei "Sean" Tan, Wei Lin "Germaine" Tan, and Weizheng Ye in Support of Motion to Dismiss Complaint* [Adv. D.I. 46]. |
| **Mirana Br.** | *Memorandum of Law of Defendant Mirana Corp. in Support of Motion to Dismiss Complaint* [Adv. D.I. 39]. |
| **Motion(s)** | The Bybit Br., Time Research Br., Mirana Br., and Individual Defs. Br., as defined herein. |
| **Plaintiffs** | Alameda Research Ltd., FTX Trading Ltd. and West Realm Shires Services, Inc. |
| **Second Ray Report** | *Second Interim Report of John J. Ray III to the Independent Directors*, filed June 26, 2023 [D.I. 1704-1]. |
| **Shamah Decl.** | *Declaration in Support Declaration of Daniel S. Shamah in Support of Defendant Bybit Fintech Ltd.'s Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim* [Adv. D.I. 36]. |
| **Time Research Br.** | *Memorandum of Law in Support of Time Research Ltd.'s Motion to Dismiss Complaint* [Adv. D.I. 32]. |

## INTRODUCTION

On the eve of these Chapter 11 cases, Defendants—a group of intertwined corporate entities and their senior officers/employees—engaged in a coordinated effort to extract hundreds of millions of dollars in estate assets by leveraging "VIP" connections to prioritize their withdrawal requests over those of other victims of the FTX Insiders' fraudulent scheme. Both before and after the filing of these Chapter 11 cases, Defendants took steps to shut down Plaintiffs' ability to withdraw assets from their accounts at Defendant Bybit's exchange. Defendants' improper withdrawals and locking of Plaintiffs' accounts on Bybit undoubtedly contributed to and exacerbated Plaintiffs' financial distress. Even now, Defendants continue to affirmatively prevent Plaintiffs from retrieving estate property, and Defendants have also orchestrated the devaluation of other tokens held by the Debtors. Defendants boldly ask this Court to bless their misdeeds on the basis of spurious legal defenses while they continue to interfere from afar with the Debtors' work to maximize recoveries for creditors. This Court should reject Defendants' Motions for multiple reasons.

*First*, despite acknowledging some (but not all) of their extensive contacts with the United States, Defendants argue that their conduct has not subjected them to personal jurisdiction in the United States. Defendants, of course, are in the best position to know the extent of their contacts with the United States, and Defendants should not be permitted to omit or hide crucial facts that may bear on the lawful exercise of jurisdiction over them. Even without the benefit of jurisdictional discovery, Plaintiffs have already identified contacts with the United States which subject Defendants to specific jurisdiction in the United States. Plaintiffs' case should not be prematurely derailed at this stage, based on an undeveloped record of Defendants' contacts with the United States, which they seek to obscure. *See In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 556 (M.D. Pa. 2009) (granting jurisdictional discovery because the "record

contains faint silhouettes of [ ] in-forum contacts but lacks a substantive portrait thereof" and "[a] period of discovery will enable plaintiffs to develop the lineaments of these relationships with the U.S. market"); *Renner* v. *Lanard Toys*, 33 F.3d 277, 283 (3d Cir. 1994) (jurisdictional discovery should be "freely permitted" when the record may be "ambiguous" as to whether a defendant has exhibited purposeful availment of a forum state) (citations omitted); *Metcalfe* v. *Renaissance Marine, Inc.*, 566 F.3d 324, 336 (3d Cir. 2009) (when "the plaintiffs' claim is not clearly frivolous, the district court should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging" its burden of alleging personal jurisdiction).

*Second*, Defendants Mirana and Time Research assert that Plaintiffs have not adequately pled fraudulent intent with respect to their withdrawals on the eve of the FTX bankruptcy, apparently hoping that the Court will overlook the overarching fraudulent scheme, of which the transfers to Mirana and Time Research are a part.  Defendants' reliance on purportedly missing "badges of fraud," which are, of course, only *substitutes* for actual intent when direct evidence is unavailable, is puzzling when Plaintiffs have more than adequately alleged that the FTX Insiders had actual intent to defraud creditors when they facilitated the transfers of funds to Mirana and Time Research.   As the Complaint alleges, FTX.com employees processed withdrawals for Mirana and Time Research ahead of other customer withdrawals to project an image of financial stability, "effectively buying silence by prioritizing withdrawals."  Complaint ¶ 51.  And even though badges of fraud are unnecessary in such circumstances, the Complaint alleges the presence of at least three such badges:  the close relationship between pre-petition Plaintiffs and Mirana and Time Research, the fact that these transfers were made at a time when FTX.com was insolvent, and that Plaintiffs had incurred substantial debts around the time the transfers were made.

-2-

*Third*, Defendants Mirana and Time Research argue that Plaintiffs' claims for fraudulent and preferential transfers under 11 U.S.C. §§ 547 and 548 do not apply extraterritorially.  But courts within the Third Circuit that have considered the issue have held to the contrary based on the plain language of the Bankruptcy Code.  *In re Maxus Energy Corp.*, 641 B.R. 467, 561 n.358 (Bankr. D. Del. 2022); *In re FAH Liquidating Corp.*, 572 B.R. 117, 125 (Bankr. D. Del. 2017).

*Fourth*, Defendants argue that Plaintiffs do not have *any* interest in the assets that Plaintiffs transferred to Defendants in satisfaction of withdrawals from Defendants' FTX Exchange accounts, and that Defendants are thus immune to Plaintiffs' fraudulent and preferential transfer claims.  But this argument rests entirely on Defendants' interpretations of isolated provisions of two extrinsic documents that Defendants attached to their Motions and identified as the "FTX Terms of Service" and "FTX.US User Agreement."  Neither of those documents is "integral to or explicitly relied upon in the complaint" and, thus, they should not be considered in resolving the Motion.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("As a general matter, a . . . court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.").  Moreover, those documents raise myriad factual issues, including when—if at all—they were effective with respect to Defendants' FTX Exchange accounts.  These "issues of fact . . . are not properly resolved on a motion to dismiss."  *Tsai* v. *Calloway*, 2023 WL 6317742, at *5 (D. Del. Sept. 28, 2023).  In any event, these documents on their face provide no basis to dismiss the Complaint.

Bybit similarly asks the Court to dismiss Plaintiffs' well-pled turnover claim based on an arbitration agreement contained in a document titled "Terms and Conditions" attached to its Motion.  But even if the Court were to consider Bybit's extraneous Terms and Conditions (which

it should not), Bybit's motion to dismiss in favor of arbitration nevertheless fails because Plaintiffs' turnover claim is a *statutory* claim based on the Bankruptcy Code that cannot be dismissed on the basis of an arbitration provision. *Hays & Co.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1155 (3d Cir. 1989). Even if Plaintiffs' turnover claim were arbitrable, courts have discretion to deny motions to dismiss in favor of arbitration, and courts in the Third Circuit have routinely denied such motions and instead granted discovery where, as here, the complaint makes no reference to an arbitration agreement. *See e.g.*, *Moon* v. *Breathless, Inc.*, No. 15-06297, 2015 WL 7720490, at *3-4 (D.N.J. Nov. 30, 2015) (denying motion to dismiss in favor of arbitration and ordering limited discovery where the agreement and arbitration provision were not referenced in or attached to the complaint and arbitrability was not "apparent on the face of the complaint").

*Fifth*, Defendants' argument that Plaintiffs failed to join allegedly necessary parties is procedurally improper because no Defendant moved to dismiss on that ground under Federal Rule of Civil Procedure 12(b)(7). [Adv. D.I. 34]. Even if Defendants had properly brought a joinder argument, they do not meet their burden of showing that the non-debtor entities they identify are necessary and indispensable parties and that joinder of those entities would be infeasible. Even if the Court found the entities to be necessary parties, it could simply order that they be joined and served with process. *Hubbard* v. *Rite Aid Corp.*, 433 F.Supp.2d 1150, 1158-59 n.3 (S.D. Cal. 2006).

*Sixth*, Defendants argue that Bybit is not violating the automatic stay by refusing to process the withdrawal of the FTX Debtors' funds, because "merely retaining possession of estate property does not violate the automatic stay." Bybit Br. at 26. But the Complaint does not allege only that Bybit is retaining possession of estate property; rather, the Complaint alleges that, surrounding the filing of the Chapter 11 cases, Bybit affirmatively "disabled withdrawals to

prevent the Debtors from securing the assets in these accounts for the benefit of their creditors."
Compl. ¶ 69.  By taking affirmative steps prevent the Debtors from making withdrawals of estate
property post-petition, Bybit disrupted the status quo in violation of the automatic stay.  *In re Thgh
Liquidating LLC,* 2020 WL 5409002, at *4 (D. Del. Sept. 9, 2020).

Defendants also argue that neither Mirana nor Bybit violated the automatic stay by
devaluing Plaintiffs' BIT tokens because it was BitDAO (n/k/a "Mantle"), a supposedly
"independent" and "autonomous" entity, that organized the so-called "community" vote to prohibit
Plaintiffs from migrating their BIT tokens to the newly-issued MNT tokens.  But Defendants'
assertions controvert the well-pled factual allegations in Plaintiffs' Complaint that (i) a senior
Bybit executive (using a Mirana email address) privately admitted to FTX Group employees that
Bybit controlled BitDAO, (ii) BitDAO's proposed migration of BIT tokens was announced shortly
after the Debtors rejected Bybit's ridiculous proposal to unwind the October 2021 token swap,
(iii) Mirana's website states that it "provide[s] investment, legal, and other advisory services for
Web3 projects including the Mantle ecosystem," and (iv) Mirana openly voted to enact the
proposal to devalue Plaintiffs' BIT tokens.  Compl. ¶ 75-77.  Any "allegations of the Defendants
to the contrary" raised in a moving brief should not be accepted as true.  *In re OPP Liquidating
Co.*, 2022 Bankr. LEXIS 651, at *18 (Bankr. D. Del. Mar. 14, 2022).  As the Complaint alleges,
the BitDAO "vote" has had a significant adverse impact on the Debtors' BIT tokens, and has
exposed the Debtors to tens of millions of dollars in potential losses.  Compl. ¶ 77.

Defendants' Motions are not well founded and should be denied in their entirety.

## BACKGROUND

In late 2021, Defendant Mirana, which is Defendant Bybit's "investment arm,"
opened an account on the FTX.com exchange and began trading cryptocurrencies.  Compl. ¶¶ 4,
46.  Mirana's account balance grew quickly, increasing to $40 million in April 2022 and to $200

million by the end of May 2022. Compl. ¶ 46. Mirana's heavy use of the FTX.com exchange attracted the attention of FTX.com employees, who reached out to set up a "VIP" "direct line of communication" and to offer additional trading perks and lower fees. *Id.* ¶ 47. Defendant Sean Tan (on behalf of Mirana), accepted this invitation, and Mirana maintained an account balance of between $300 million to $500 million until the Petition Date. *Id.* ¶¶ 46-47. In May 2022, Mirana also reached out to FTX.com to open a separate account in the name of Defendant Time Research. *Id.* ¶ 48. The KYC material submitted on behalf of Time Research reflected that Time Research and Mirana were registered at the same Seychelles address, and that Time Research's "operating address" was the personal address in China belonging to Mirana's finance director. *Id.* ¶ 48.

On November 2, 2022, a leaked Alameda balance sheet revealed to the public that Alameda's solvency hinged on a multibillion-dollar valuation that Alameda had assigned to its holdings of FTT. *Id.* ¶ 49. Four days later, the FTX Group's primary competitor, Binance, announced an intent to liquidate its FTT holdings. *Id.* These revelations triggered a liquidity crisis at the FTX Group. *Id.* Like other customers, Mirana and Time Research quickly sought to extract the funds reflected in their FTX.com Exchange accounts. *Id.* ¶ 50. Unlike other customers, however, Mirana and Time Research leveraged their "VIP" status to get FTX.com employees to process their withdrawals ahead of other pending customer requests. *Id.* ¶¶ 50-51, 53.

As the FTX Group fought to stave off the worsening bank run, Sam Bankman-Fried made public statements that the concerns were based entirely on "rumors," and that the FTX Group had sufficient assets and liquidity to satisfy withdrawal requests. *See id.* ¶ 51. Secretly, however, the FTX Group monitored public statements by major cryptocurrency industry participants like Bybit. *Id.* FTX.com employees raced to satisfy Mirana's requests "in an effort to pacify" it, "effectively buying silence by prioritizing withdrawals." *Id.* ¶ 51.

As the liquidity crisis worsened, FTX.com was forced to halt withdrawals on November 8, 2022. *Id.* ¶ 54. After the dust settled, Mirana and Time Research had successfully leapfrogged other customers to withdraw more than $327 million and $23 million respectively from their FTX.com Exchange accounts during November 7 and 8 alone. *Id.* ¶¶ 52, 54. Defendants Sin Wei "Sean" Tan, Wei Lin "Germaine" Tan, Weizheng Ye, and Nashon Loo Shun Liang, senior Mirana executives or their associates, also successfully withdrew large sums of money from their accounts on the FTX Exchanges. *Id.* ¶¶ 57, 60-65.

Not content to have cut the line ahead of other customers, Mirana and Bybit have taken and continue to take actions post-petition that have harmed Plaintiffs' estates. As a trading firm, Alameda opened six accounts on the Bybit exchange, five nominally registered in the name of entities other than Alameda. *Id.* ¶¶ 68-69. Each of these accounts were funded, controlled by, and used solely for the benefit of the Debtors and their subsidiaries. *Id.* ¶ 69. Indeed, each account automatically forwarded their e-mails to info@alameda-research.com, or had their recovery e-mail set to that address. *Id.* These accounts collectively hold assets valued at more than $125 million as of November 10, 2023. *Id.* ¶ 68. As the Debtors and their advisors undertook to recover these assets, Bybit cut off the Debtors' ability to withdraw the assets unless and until Mirana is reimbursed approximately $20 million remaining in its FTX.com account. *Id.* ¶ 68.

Similarly, Defendants have stymied the Debtors' and their advisors' attempts to safeguard BIT tokens received from Bybit pursuant to an October 2021 swap agreement. *Id.* ¶ 75. In May 2023, Bybit approached the Debtors to propose an "unwinding" of the swap pursuant to which the Debtors would return BIT tokens then valued at approximately $50 million in exchange for FTT tokens valued at approximately $4 million at then-current pricing. *Id.* ¶ 76. When the Debtors declined, BitDAO, a purportedly "decentralized autonomous organization" controlled by

"community members" announced that it would rebrand as "Mantle" and that all BIT tokens would be converted at a 1:1 ration with MNT tokens. *Id.* ¶¶ 75-76. After the Debtors sought to convert their BIT tokens, BitDAO singled them out, launching a "community vote" to decide whether to "restrict the automatic migrability of FTX Group's $BIT tokens, pending resolution of related issues." *Id.* ¶ 76. While Mirana and Bybit pretend that BitDAO is an independent third party, a senior Bybit executive, using her Mirana e-mail address, previously acknowledged privately that Bybit controlled BitDAO, *Id.* ¶¶ 76-77, and Mirana publicly acknowledges that it provides "investment, legal, and other advisory services" to Mantle. *Id.* ¶ 77 n.19. After Defendants effectively tried to steal the Debtors' BIT tokens through the "community vote" of their front organization BitDAO, the Debtors informed Bybit and Mirana that their actions constitute clear violations of the automatic stay, but Bybit and Mirana refused to change course. *Id.* ¶ 77. This lawsuit followed.

## LEGAL STANDARD

In deciding a motion to dismiss for lack of personal jurisdiction, courts generally defer to a plaintiff's allegations. *See*, *e.g.*, *Toys "R" Us, Inc.* v. *Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003) ("It is well established that in deciding a motion to dismiss for lack of jurisdiction, a court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff."). Although plaintiff bears the burden of establishing personal jurisdiction once the defendant challenges it, *Miller Yacht Sales, Inc.* v. *Smith,* 384 F.3d 93, 97 (3d Cir. 2004), absent jurisdictional discovery or an evidentiary hearing, plaintiff need only make a *prima facie* showing that personal jurisdiction exists over the defendant. *See Metcalfe* v. *Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) ("If the district court does not hold an evidentiary hearing, 'the plaintiff[s] need only establish a *prima facie* case of personal jurisdiction'"); *Finjan LLC* v. *Trustwave Holdings, Inc.*, 2021 WL 5051147, at *4 (D. Del. Oct. 29, 2021) ("[t]o survive a motion

to dismiss in the absence of jurisdictional discovery, plaintiffs need only make a *prima facie* showing of jurisdiction").

A plaintiff may meet this burden by "establishing with reasonable particularity sufficient contacts between the defendant and the forum." *Mellon Bank PSFS, Nat'l Ass'n* v. *Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992); *see also In re Pursuit Capital Mgmt., LLC*, 595 B.R. 631, 646 (Bankr. D. Del. 2018) (quoting *Provident Nat'l Bank* v. *Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987)) (a plaintiff may make a *prima facie* showing by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state to support jurisdiction"). In bankruptcy cases, the relevant forum for purposes of personal jurisdiction is the United States in general, not the state in which the bankruptcy court sits. *See In re Tandycrafts, Inc.*, 317 B.R. 287, 289 (Bankr. D. Del. 2004); Fed. R. Bankr. P. 7004. Plaintiff "must sustain [its] burden of proof ... through sworn affidavits or other competent evidence." *Sanitec Indus., Inc.* v. *Sanitec Worldwide, Ltd.*, 376 F. Supp. 2d 571, 573 (D. Del. 2005) (citing *Time Share Vacation Club* v. *Atlantic Resorts, Ltd.*, 735 F.2d 61, 67 n.9 (3d Cir. 1984)).

A court may exercise specific personal jurisdiction over a nonresident defendant that purposefully avails itself of the relevant forum. *See Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 472 (1985) (holding that specific personal jurisdiction exists where a foreign defendant "purposefully direct[s] his activities at residents of the forum," and the underlying cause of action "arise[s] out of or relate[s] to those activities."); *In re Uni-Marts, LLC*, 405 B.R. 113, 122 (Bankr. D. Del. 2009) (quoting *Max Daetwyler Corp.* v. *Meyer*, 762 F.2d 290, 293 (3d Cir.1985)) (requiring "that certain minimum contacts exist between the non-resident defendant and the forum"). Purposeful "minimum contacts" are the "constitutional touchstone" of the due process

-9-

analysis. *Burger King*, 471 U.S. at 474. The requirement of "minimum contacts" ensures that non-residents have fair warning that they may be subject to litigation in the forum, *id*. at 472—which in a bankruptcy case is minimum contacts with the U.S. A court has jurisdiction when "the defendant's conduct and connection with the forum [ ] are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U.S. 286, 297 (1980); *see also International Shoe Co.* v. *Washington*, 326 U.S. 310, 316 (1945) ("due process requires only that . . . [the defendant] have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice'"). For purposes of specific personal jurisdiction, the defendant's activity need not have taken place within the forum, *Burger King*, 471 U.S. at 476, and a single transaction with the forum will suffice, *see McGee* v. *Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957), so long as there is "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . thus invoking the benefits and protections of its laws." *Hanson* v. *Denckla*, 357 U.S. 235, 253 (1958).

Further, in deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Black* v. *Montgomery Cty.*, 835 F.3d 358, 364 (3d Cir. 2016) (quoting *Phillips* v. *Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2000) (plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" (citing *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 556 (2007))). "[W]hen a federal court reviews the sufficiency of a complaint . . . the issue is not whether [the] plaintiff[s] will ultimately prevail

but whether the claimant is entitled to offer evidence to support the claims." *Boyle* v. *City of Phil.*, 2018 WL 994218, at *4 (E.D. Pa. Feb. 20, 2018).

For purposes of Rule 12(b)(6), the court "look[s] to the complaint and attached exhibits in ruling on a motion to dismiss." *Philip A. Templeton, M.D., P.A.* v. *EmCare, Inc.*, 868 F. Supp. 2d 333, 338 (D. Del. June 15, 2012). The Court should not consider a document outside of the pleadings unless the document is "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426. It is not permissible on a Rule 12(b)(6) motion to rely on material outside the complaint to "make a finding of fact that controvert[s] the plaintiff's own factual assertions set out in its complaint." *Global Network Commc'ns, Inc.* v. *City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006); *see also In re Student Fin. Corp.*, 335 B.R. 539, 546 (D. Del. 2005) (the "purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case"). Nor should a Rule 12(b)(6) motion be granted based on an affirmative defense predicated on disputed facts. *See In re DVI, Inc.*, 2008 WL 4239120, at *11 (Bankr. D. Del. Sept. 16, 2008) ("An affirmative defense with disputed facts is not a proper basis to dismiss a complaint.").

## ARGUMENT

### I.   THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS, OR, IN THE ALTERNATIVE, PLAINTIFFS SHOULD BE GRANTED JURISDICTIONAL DISCOVERY.

This Court has personal jurisdiction over Defendants because they have purposefully availed themselves of the United States such that they "should reasonably anticipate being haled into court there." *World-Wide Volkswagen*, 444 U.S. at 297.

At the outset, Defendant Sean Tan does not dispute that he is subject to personal jurisdiction (and indeed acknowledges that he has submitted a proof of claim in these proceedings). *See* Individual Defs. Br. at 3, 5-9. Defendant Weizheng Ye also concedes that he is subject to

personal jurisdiction, at least with respect to his transactions involving his FTX US account.  *See id*. at 5-9.  The remaining corporate and individual defendants offer various arguments as to why they are not subject to personal jurisdiction, none of which warrants dismissal.

Defendants Mirana and Bybit ignore that their post-petition conduct—namely, withholding estate property, and flagrantly violating the automatic stay by taking steps to devalue Plaintiffs' tokens—has resulted in tangible harm in the United States, notwithstanding that these actions purportedly took place abroad.  These intentional acts directed towards Plaintiffs' estates and the resulting tangible harm give rise to a clear *prima facie* case that this Court may exercise personal jurisdiction over Mirana and Bybit.  *Burger King*, 471 U.S. at 476; *cf. Calder* v. *Jones*, 465 U.S. 783, 791 (1984) (intentional conduct and resulting injury sufficient to establish a *prima facie* case for *in personam* jurisdiction).

Defendants' other concessions, and the factual record Plaintiffs have marshalled—even without the benefit of jurisdictional discovery—also show that Defendants have sufficient U.S. contacts to establish that they have purposefully availed themselves of the United States, and thus that the exercise of personal jurisdiction over them would comport with notions of fair play and substantial justice.

Under the guise of operating abroad, Defendants took self-serving actions that disadvantaged other victims of the FTX Insiders' fraudulent scheme, and now continue to take actions designed to obstruct and prevent recovery, thereby harming Plaintiffs' creditors.  This Court should not countenance such gamesmanship and should permit Plaintiffs to hold Defendants accountable for their misconduct.

A.      **Mirana's and Bybit's Post-Petition Actions Render Them Subject to the Jurisdiction of This Court.**

As a threshold matter, Mirana and Bybit make much of their purported operations abroad, arguing that their international presence means that this Court may not exercise personal jurisdiction over them.  Mirana Br. at 2 ("Mirana is a foreign company; it is incorporated in the Republic of the Seychelles, maintains a principal office and principal place of business in Singapore, has no office in the United States, and none of its directors or senior officers reside here."); Bybit Br. at 1 ("Bybit is a Seychelles-based crypto platform that Debtors do not allege has any connection to the U.S.").  However, for purposes of specific personal jurisdiction, the defendant's activity need not have taken place within the forum, *Burger King*, 471 U.S. at 476, and a single transaction with the forum will suffice, *see McGee* v. *Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957), so long as there is "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . thus invoking the benefits and protections of its laws." *Hanson* v. *Denckla*, 357 U.S. 235, 253 (1958).  Further, jurisdiction "may not be avoided merely because the defendant did not *physically* enter the forum State." *Burger King*, 471 U.S. at 476 (emphasis in original).  Rather, so long as the defendant's "efforts are 'purposefully directed' toward residents of another State, [courts] have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id.*

Both Mirana and Bybit have purposefully directed efforts towards withholding and devaluing assets of the Plaintiffs' estates *in the United States*, thereby subjecting themselves to the jurisdiction of this Court.  *Cf. Calder*, 465 U.S. at 791 (intentional conduct and resulting injury sufficient to establish a *prima facie* case for *in personam* jurisdiction ).  Plaintiffs allege that Bybit, with full awareness of these Chapter 11 cases and the need to recover assets for Plaintiffs' creditors, refused to transfer estate assets to the Debtors post-petition by disabling withdrawals

-13-

after the Petition Date.  *See* Compl. ¶¶ 67, 77.  In addition to intentionally depriving the Plaintiffs of estate property, Bybit has "caused the Debtors to incur significant costs in seeking to secure those assets," all in an attempt to "strong-arm its way around the bankruptcy process." *Id.* ¶ 74.

Mirana's and Bybit's conduct with respect to Plaintiffs' BIT tokens also has affected estate property in the United States.  The Complaint explicitly alleges that, notwithstanding their knowledge of these Chapter 11 cases, Mirana and Bybit orchestrated a "community vote" that would restrict the conversion of Plaintiffs' BIT tokens into the newly-formed MNT tokens.  Compl. ¶¶ 75-77.  While Mirana and Bybit pretend that the conversion was coordinated by a third-party entity controlled by "community members," the Complaint alleges that they control that entity.  Indeed, a senior Bybit executive, using her Mirana e-mail address, confirmed that Bybit "controlled" BitDAO, notwithstanding any purported "community vote." Compl. ¶¶ 75, 77.  And Mirana admits that it provides "investment, legal, and other advisory services" for BitDAO.  Compl. ¶ 77 n.19.

Construing the facts in the light most favorable to Plaintiffs, these actions plainly give rise to specific personal jurisdiction over Mirana and Bybit.  *See Burger King*, 471 U.S. at 476.  But for Bybit's refusal to turnover estate property, and Mirana and Bybit's control over the entity which seeks to devalue Plaintiffs' tokens, there would be no claim for turnover or violations of the automatic stay.  *See Farmers Ins. Exch.* v. *Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911, 914 (9th Cir. 1990) ("An action arises out of contacts with the forum if, but for those contacts, the cause would not have arisen."); *Derbin* v. *Biocompatibles Intl. PLC*, 1998 WL 551976, at *3 (E.D. Pa. Aug. 11, 1998) ("When a defendant purposely targets its conduct to cause harm in a forum state, it can reasonably expect to be haled into that state's courts.  Thus, even a single contact may be sufficient to create jurisdiction, provided that the principle of 'fair play and substantial justice'

-14-

is observed."); *cf. Calder*, 465 U.S. at 791.  Accordingly, Mirana and Bybit's purposeful availment is sufficiently extensive that they should reasonably anticipate that their actions would subject them to suit in the United States.

**B.    Defendants' Contacts With the United States Otherwise Give Rise to Personal Jurisdiction.**

**1.    Mirana**

Mirana has conceded that it has substantial contacts with the United States.  In particular, Mirana admits that, during the relevant period, at least five of its employees or contractors—representing nearly 15% of Mirana's employees or contractors around the world— "resided in the United States and worked remotely," and that one such individual continues to reside and work in the United States today.  Mirana Br. at 6; Chen Decl. ¶ 7.  And while Mirana contends that its "directors and senior officers reside and work in Singapore," but Plaintiffs' initial research (without the benefit of discovery) has revealed that at least one such person, an individual named Yaxi Zhu, who is listed as a director and 50% shareholder of Mirana on the certificate of incumbency that Mirana provided to FTX in September 2021, lists her location on X (formerly Twitter) as New York City.  McGuire Decl., Exs. 1, 2.[2]

Moreover, shortly after Mirana pressured FTX Group employees to process its withdrawal requests, Mirana invested in at least two companies located in the United States. McGuire Decl., Exs. 3-6.  In February 2023, Mirana announced an investment in Seattle-based Kaito AI, an AI-optimized search engine, and in March 2023, Mirana announced an investment in Delaware-incorporated Eigen Labs.  McGuire Decl., Exs. 3-6.  Given the proximity between the withdrawals underlying this action and these investments, it is likely that Mirana invested portions of its withdrawals in these and other U.S.-based companies.

---

[2]     Plaintiffs' initial research also reflects that Zhu maintains a residence in New York City.

2.       **Bybit**

Bybit characterizes itself as "a Seychelles entity that conducts its business abroad" and suggests that Bybit has no connection to the United States, whether through the conduct alleged in the complaint or its other activities. Bybit Br. at 1. This fundamentally mischaracterizes Plaintiffs' allegations and the reality of Bybit's activities, which include extensive contacts with the United States.

Bybit does not exist in a vacuum. In addition to operating one of the largest cryptocurrency exchanges in the world, Bybit also acts through its "investment arm," Mirana, which Bybit's co-founder and CEO has admitted "manage[s] some [B]ybit company asset[s]." McGuire Decl., Ex. 7.[3] As alleged in Plaintiffs' Complaint, Bybit is deeply intertwined with the other corporate and individual defendants in this action, with overlapping employees, affiliations and financial interests. As just one example, the October 2021 "token swap" was negotiated by a senior Bybit executive using her Mirana email address and resulted in the Debtors' BIT tokens being delivered from an ostensibly independent third party, BitDAO, which the Bybit/Mirana executive privately explained was controlled by Bybit. Compl. ¶¶ 76-77 The Complaint also alleges that Bybit has engaged in numerous actions post-petition directed toward the Debtors in these chapter 11 cases and their assets, including (i) willfully violating the automatic stay by using its control of BitDAO to devalue estate assets, and (ii) taking steps to restrict the Debtors' ability to secure assets held in their Bybit accounts. Compl. ¶¶ 67, 69. Bybit's suggestion that these other connections and intentional actions can be ignored in assessing personal jurisdiction is wrong.

Moreover, even without the benefit of discovery, Plaintiffs have identified extensive connections between Bybit and the United States. Although Bybit claims that it does

---

[3]       @BenBybit, X (Jan. 23, 2023 12:55 AM), https://twitter.com/benbybit/status/1616313439617486850.

not offer services to U.S. citizens given U.S. regulatory requirements, U.S.-based customers may still access and trade on Bybit through the use of a simple virtual private network, or "VPN." McGuire Decl., Ex. 8.  Until recently, Bybit used Silvergate Bank, a California-based bank, as its end-point processing partner for U.S. dollar transactions.  McGuire Decl., Ex. 9.  Bybit also has registered various business and trade names throughout the United States.  McGuire Decl., Exs. 10-15.  In particular, (i) Bybit registered Bybit Fintec US Limited LLC in Delaware on November 4, 2020; (ii) Bybit incorporated Bybit (USA), Inc. in Delaware on December 28, 2021 and registered that company to conduct business in Georgia and New York; and (iii) Bybit (USA), Inc. registered the trade names Bybit US and BybitX in Louisiana on August 22, 2022.  *Id.*  These extensive US connections are more than sufficient to justify the court exercising personal jurisdiction over Bybit.

### 3.    Time Research

Time Research also has extensive connections with the United States.  Time Research admits that during the relevant period, its U.S.-based "Treasury and Trading Operations Specialist" "initiated withdrawal requests at the direction of Time Research management and communicated with FTX.com personnel regarding such requests."  Time Research Br. at 4; Haizhou Decl. ¶ 9.  Time Research also admits that this same U.S.-based employee "is also the former nominee shareholder for the ultimate beneficial owner of Time Research."  Time Research Br. at 4.  Time Research further concedes that it has other potentially relevant contacts with the United States, including two U.S. bank accounts held during the relevant period (one of which Time Research continues to use today), "an account with Circle, a U.S.-based manager of stablecoin, which operates as a channel to convert cryptocurrency assets to fiat currency," and another U.S.-based contractor currently working for Time Research.  Time Research Br. at 4-5; Haizhou Decl. ¶¶ 10-13.  Moreover, although Time Research largely ignores this in its brief, the

Complaint specifically alleges that Time Research is registered to the same Seychelles address as Mirana, that Time Research's "operating address" was the personal address in China of Mirana's finance director, and that it was Mirana that contacted FTX.com to open an account in the name of Time Research.  Compl. ¶ 48.

### 4.    Weizheng Ye and Germaine Tan

Weizheng Ye concedes that Plaintiffs' claims based on transfers from the FTX US exchange render him subject to personal jurisdiction as to those transfers.  Individual Defs. Br. at 8.  Defendants Weizheng Ye, Germaine Tan, and Sean Tan are closely intertwined.  In addition to serving as a senior executive of Mirana, Sean Tan and Weizheng Ye served together as directors of "Moonglow Capital Limited."  Compl. ¶ 27.  The KYC information associated with Germaine Tan's FTX.com account reflects the same residential address listed for that of Weizheng Ye. Compl. ¶ 28.  And as alleged in the Complaint, Germaine Tan used her FTX.com and FTX US accounts to transfer funds to (and to receive transfers from) FTX.com accounts registered in the names of Mirana, Sean Tan and Weizheng Ye.  Compl. ¶ 28.  *See* Marshall Decl., Ex. 1.  As just one example, on May 7, 2022, Mirana transferred 3,390,600 USDC to Germaine Tan's FTX.com account, and just for minutes later, Germaine Tan transferred 1,859,357 USDC to Sean Tan's FTX.com account.  Compl. ¶ 28 n.6.  *See* Marshall Decl., Ex. 1.  Ye Weizheng also made a number of fiat transfers to a bank account located in the United States, several of which occurred only minutes after Ye Weizheng received a USDC transfer of the same amount from Germaine Tan. Marshall Decl., Ex. 2.

### 5.    Nashon Loo

The Complaint alleges that several "FTX.com and FTX US accounts were registered in the name of Nashon Loo," and that those accounts "made transfers to (and received transfers from FTX.com and FTX US accounts" registered in the name of Sean Tan and Germaine

Tan.  Compl. ¶ 30.  *See* Marshall Decl., Exs. 1, 3.  Nashon Loo also received fiat withdrawals from his FTX.com account that were processed through Silvergate, a U.S. bank, and, on at least three occasions, Defendant Sean Tan transferred stablecoins to Nashon Loo's FTX.com account, followed by Nashon Loo withdrawing the same amounts in fiat in transfers processed through Silvergate.  Marshall Decl., Exs. 1, 2.

  **C.**  **Defendants Have Sufficient Minimum Contacts With the United States Such That Exercising Personal Jurisdiction Over Them Will Not Offend Due Process.**

    As demonstrated above, Defendants have more than the requisite minimum contacts with the United States such that exercising jurisdiction over them will not offend due process.  Indeed, Defendants' contacts with the U.S. are such that they "should reasonably anticipate being haled into court there."  *World-Wide Volkswagen*, 444 U.S. at 297.

    In evaluating whether the assertion of personal jurisdiction comports with "fair play and substantial justice," courts consider:  (i) "the burden on the defendant," (ii) "the forum State's interest in adjudicating the dispute," (iii) "the plaintiff's interest in obtaining convenient and effective relief," (iv) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and (v) the "shared interest of the several States in furthering fundamental substantive social policies."  *Burger King,* 471 U.S. at 477.  All of these factors support the exercise of jurisdiction in this case.

    *First*, the Court's exercise of jurisdiction over Defendants—some of whose directors or employees reside in the United States—would not make it "so gravely difficult and inconvenient that [Defendants] [are] at a severe disadvantage in comparison to [Plaintiffs]," which have filed for Chapter 11 in this Court.  *In re DBSI, Inc.*, 467 B.R. 309, 315 (Bankr. D. Del. 2012) (quoting *Burger King*, 471 U.S. at 478).

*Second*, the U.S. has a strong interest in applying the provisions of its bankruptcy laws, especially in a high-profile case such as this in which FTX customers and creditors have suffered significant losses due to the malfeasance of the FTX Insiders and others.  *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 440 B.R. 274, 281 (Bankr. S.D.N.Y. 2010).  Here, Plaintiffs' claims against Defendants arise under the fraudulent transfer, preference, and turnover provisions of the U.S. Bankruptcy Code.  (Compl. Counts 1–6.)

*Third*, Plaintiffs also have an interest in litigating in the U.S. to obtain the most convenient and effective relief.  Although all seven defendants are purportedly registered or domiciled in either the Seychelles or Singapore (Compl. ¶¶ 24-30), they engage in business activities and have employees around the world, including in the U.S.  The substantial core of the activities at issue in this complaint indisputably involve actions taken in the U.S., or directed toward the assets of the Debtors in these Chapter 11 cases.  Accordingly, requiring Defendants to litigate in this Court is the most efficient and convenient way to resolve the action.  *See Tristrata Tech., Inc.* v. *Emulgen Labs., Inc.*, 537 F. Supp. 2d 635, 642 (D. Del. 2008) ("the judicial system's interest in the efficient resolution of [Plaintiff's] claims against [Defendant] and its co-defendants in a single action before this Court beg the Court's conclusion that the assertion of personal jurisdiction over [Defendant] will comport with fair play and substantial justice"); *In re DBSI, Inc.*, 451 B.R. 373, 378 (Bankr. D. Del. 2011) (finding that, even if litigating in the forum would impose a burden on the foreign defendant, it would avoid the expense of "duplicative litigation [that] would be borne by the creditors for whose benefit the fraudulent transfers actions are meant to serve").  By contrast, requiring Plaintiffs to litigate the same issues simultaneously in this Court, Singapore, the Seychelles, and potentially elsewhere would needlessly waste the resources of the Debtors and their creditors.

*Finally*, the judicial systems of the U.S. and Singapore are rooted in similar common law traditions, which ensure that the procedural and substantive interests of both nations are not offended.  *See BCS Bus. Consulting Servs. PTE. Ltd.* v. *Baker*, 2023 U.S. Dist. LEXIS 156573, at *17 (C.D. Cal. Sept. 5, 2023) ("Singapore has a common law-based legal system"); .

In short, Defendants have sufficient minimum contacts with the U.S., and the interests of the Plaintiffs and the forum in exercising jurisdiction over this suit outweigh any potential burden on Defendants.  *See Asahi Metal Indus. Co.* v. *Superior Ct.*, 480 U.S. 102, 114 (1987) ("When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even [ ] serious burdens placed on [foreign] defendant[s]").

**D.** **Should the Court Find That Plaintiffs Have Not Made a *Prima Facie* Showing of Personal Jurisdiction, Plaintiffs Are Entitled to Jurisdictional Discovery.**

If the Court were to find that Plaintiffs have not met their burden to make a *prima facie* showing of personal jurisdiction over certain of the Defendants, the Court should permit Plaintiffs to conduct jurisdictional discovery.

Jurisdictional discovery is appropriate where the record is  ambiguous as to whether a defendant has purposefully availed itself of the forum.  *Lanard Toys*, 33 F.3d at 283.  Indeed, as a general matter, if "the plaintiff's claim is not clearly frivolous, the district court should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging" its burden of alleging personal jurisdiction.  *Metcalfe*, 566 F.3d at 336 (internal alterations omitted); *see also In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d at 572 (courts should "generally permit jurisdictional discovery prior to dismissing a defendant for lack of personal jurisdiction"); *Registered Agents, Ltd.* v. *Registered Agent, Inc.*, 880 F. Supp. 2d 541, 548 (D. Del. 2012) ("[j]urisdictional discovery is 'particularly appropriate where the defendant is a corporation'")

(quoting *Metcalfe*, 566 F.3d at 336)); *Lanard Toys*, 33 F.3d at 283 ("Numerous cases have sustained the right of plaintiffs to conduct discovery before the district court dismisses for lack of personal jurisdiction.").  Courts, including this Court, have permitted jurisdictional discovery where a plaintiff has made a "sufficient start" towards a *prima facie* case, a standard that is more than met here.  *See Uebler* v. *Boss Media, AB*, 363 F. Supp. 2d 499, 506 (E.D.N.Y. 2005); *In re Trans World Airlines*, No. 01-00056, Adv. No. 03-70129, 2003 WL 21087970, at *2 (Bankr. D. Del. May 6, 2003) (granting jurisdictional discovery because "it is possible [Defendant] may have such additional ties to the United States . . . that a finding of *in personam* jurisdiction may be warranted"); *In re Bernard L. Madoff Inv. Secs. LLC*, 2012 WL 2254995, at *7-9 (Bankr. S.D.N.Y. June 15, 2012) (permitting jurisdictional discovery to determine relevant jurisdictional facts surrounding moving defendant).

Where, as here, "plaintiff[s] present[ ] factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts between the party and the forum state, the plaintiff[s'] right to conduct jurisdictional discovery should be sustained." *Toys "R" Us, Inc.*, 318 F.3d at 456 (internal quotation marks and citations omitted).  In deciding whether plaintiffs are entitled to jurisdictional discovery, any factual disputes "between the plaintiff and defendant must be resolved in favor of the plaintiff." *Godo Kaisha IP Bridge 1* v. *TCL Commun. Tech. Holdings Ltd.,* 2016 WL 4413140, at *4 (D. Del. Aug. 17, 2016), *report and recommendation adopted*, 2016 WL 5723653 (D. Del. Sept. 29, 2016); *see also In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d at 556 (stating that the court must "construe disputed facts in favor of plaintiff" in granting jurisdictional discovery) (internal quotation marks and citation omitted).

To the extent that the Court concludes that Plaintiffs have not met the threshold for certain defendants, jurisdictional discovery would permit Plaintiffs to fully develop the facts concerning each of the Defendants' contacts with the United States.  Such discovery is particularly appropriate where, as here, the declarations that Defendants submitted to the Court "contain a number of discrepancies, leaving questions that must be resolved in order to determine whether personal jurisdiction exists."  *In re Bernard L. Madoff Inv. Sec. LLC*, 2012 WL 2254995, at *6-7. For example, although Mirana told the Court that its "directors and senior officers reside and work in Singapore," Plaintiffs' initial research has revealed that a director and equal shareholder of Mirana resides in New York City.  McGuire Decl., Exs. 1-2.  Moreover, following the numerous withdrawals from the FTX.com platform, Mirana made significant investments in the United States, likely funded in part by the improper withdrawals.  McGuire Decl., Exs. 3-6.

Similarly, Mirana implies that it has no relationship with other Defendants in this action.  *See* Chen Decl. ¶ 15.  But the facts paint a different picture, with the Defendants appearing to be inextricably intertwined.   The Complaint alleges that a Mirana employee "contacted FTX.com to open an account in the name of . . . Time Research" and submitted KYC documentation for Time Research that listed an "operating address" which was the "same Chinese address listed in Mirana's KYC materials as the personal address of Mirana's finance director." Compl. ¶ 48.  Similarly, an employee purportedly operating on behalf of Bybit, but using a Mirana e-mail address, negotiated the BIT/FTT token swap.  Compl. ¶ 75.  Bybit further underscored the interconnected nature of the companies when it refused to allow Plaintiffs to access estate property on its exchange "unless and until Mirana was reimbursed in full for the remaining approximately $20 million balance that Mirana" was unable to withdraw before transactions were halted.  Compl. ¶ 67.  *See Kinetic Instruments, Inc.* v. *Lares*, 802 F. Supp. 976, 988 (S.D.N.Y. 1992) (denying

motion to dismiss and granting jurisdictional discovery to "shed light on such issues as the defendant's control over the corporation and his alleged manipulation of corporate assets"); *Stratagem Dev. Corp.* v. *Heron Int'l N.V.*, 153 F.R.D. 535, 547-48 (S.D.N.Y. 1999) ("Further discovery may elucidate the degree of control WGS exercised over WGS-NY during the relevant time period."). Jurisdictional discovery therefore would be appropriate for Plaintiffs to confirm the relationship, organizational structure, transactions, and personnel associated with each Defendant. *In re Bernard L. Madoff Inv. Sec. LLC*, 2012 WL 2254995, at *9 (need for discovery "bolstered" where "facts necessary to establish personal jurisdiction lie within defendant's exclusive knowledge.") (internal quotation marks and citation omitted).

Accordingly, if the Court concludes that Plaintiffs fall short for one or more Defendants, Plaintiffs should be able to take jurisdictional discovery as to those Defendants, which would serve to clarify the interconnected nature of the Defendants in this action. *Lanard Toys*, 33 F.3d at 283.

## II.   PLAINTIFFS HAVE AN ENFORCEABLE INTEREST IN THE FUNDS THEY SEEK TO RECOVER.

It is "well-settled case law" that deposits in "accounts under the legal title of the debtor . . . are presumptively considered property of the debtor's estate." *See In re FBI Wind Down, Inc.*, 581 B.R. 387, 400 (Bankr. D. Del. 2018) (citation omitted). The Plaintiffs owned the bank accounts and wallets to which customer deposits were transferred. *See* First Ray Report at 24-26; Second Ray Report at 11-12; Disclosure Statement at 22, 50. Thus, Plaintiffs have an enforceable property interest in assets that Plaintiffs transferred to Defendants from the bank accounts or cryptocurrency wallets, to which Plaintiffs had legal title. Defendants' attempt to rebut this presumption fails because (i) it improperly relies on (and incorrectly interprets) two documents outside the Complaint—documents titled "FTX Terms of Service" and the "FTX.US User

Agreement," which the Court should not consider on a motion to dismiss—and, (ii) in any event, Defendants provide no support for their assertion that those two documents even applied to any of the transfers at issue.

**A.      The Law Is Clear That Plaintiffs Have Title to the Transferred Assets.**

The Court should reject Defendants' argument that Plaintiffs have no enforceable interest in the transferred assets at issue.  There can be no dispute that the wallets in which digital assets were stored were "under the legal title of the" Plaintiffs.  *See* First Ray Report at 24-26; Second Ray Report at 11-12; Disclosure Statement at 22, 44.  Therefore, those deposits "are presumptively considered property of the debtor's estate." *In re FBI Wind Down, Inc.*, 581 B.R. at 400 (citation omitted); *see also In re Southmark Corp.*, 49 F.3d 1111, 1116-17 (5th Cir. 1995) (finding that debtor had property interest in funds in a "general bank account containing commingled funds, to which [it] held complete legal title"); *In re Meadows*, 396 B.R. 485, 490 (B.A.P. 6th Cir. 2008) (holding that funds in debtor's checking account are property of the estate); *In re USA Diversified Prods., Inc.*, 100 F.3d 53, 55 (7th Cir. 1996) ("Property of the debtor is defined to include 'all legal or equitable interests of the debtor' . . . and obviously that includes the interest that a depositor has in the money in his account, more precisely the money owed him by the bank by virtue of the account.") (citation omitted).[4]  Thus, drawing all reasonable inferences in Plaintiffs' favor, the Complaint adequately alleges that Plaintiffs had a property interest in the transferred assets.

---

[4]      *See also In re Amdura Corp.*, 75 F.3d 1447, 1451 (10th Cir. 1996) ("We presume that deposits in a bank to the credit of a bankruptcy debtor belong to the entity in whose name the account is established."); 5 *Collier on Bankruptcy* 541.08 (16th ed. 2023) ("Deposits in the debtor's bank accounts become property of the estate under [11 U.S.C. §] 541(a)(1).").

**B.      Defendants' Reference to Extrinsic Documents Does Not Warrant Dismissal.**

**1.      The Court Should Disregard the Extrinsic Documents on Which Defendants Improperly Rely.**

The law is clear that courts "look to the complaint and attached exhibits in ruling on a motion to dismiss." *Philip A. Templeton, M.D., P.A.* v. *EmCare, Inc.*, 868 F. Supp. 2d 333, 338 (D. Del. 2012). "[A]n undisputedly authentic document attached to [a] motion" to dismiss "may be considered without converting [the motion] to a summary judgment motion" *only if* that document "forms the basis of a plaintiff's claim." *Pinnavaia* v. *Colotex Asbestos Settlement Tr.*, 271 F. Supp. 3d 705, 709 (D. Del. 2017) (citing *Pension Ben. Guar. Corp.* v. *White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). "A document forms the basis of a claim if it is 'integral to or explicitly relied upon in the complaint.'" *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426). That is not the case here.

Some (but not all) Defendants attach as exhibits to the Motions a document titled "FTX Terms of Service," Daucher Decl., Ex. 5; Haizhou Decl., Ex. 1; Behmke Decl., Ex. 1, and a document titled "FTX.US User Agreement," Behmke Decl., Ex. 2. But these documents are neither "integral to" nor "explicitly relied upon in the [C]omplaint." Indeed, the Complaint does not even *reference* any "terms of service" or "user agreement." Therefore, the Court should not consider the "FTX Terms of Service" or "FTX.US User Agreement" for purposes of deciding the instant Motions.[5]

**2.      Defendants' Extrinsic Documents Do Not Provide a Basis To Dismiss Plaintiffs' Claims in Any Event.**

Even if the Court were to consider the "FTX Terms of Service" and "FTX.US User Agreement," those documents do not provide a basis for the Court to rule, on a motion to dismiss,

---

[5]      For the same reasons contained herein, the Court should disregard the claim that Mirana did not receive a $500,000 transfer, as alleged in the Complaint. Mirana Br. at 18.

that Plaintiffs have no property interest in the transferred assets.  *See*, *e.g.*, Mirana Br. at 28.  At most, Defendants' arguments raise a number of factual questions, none of which is appropriate for this Court to decide on a motion to dismiss, including:  (i) whether and to what extent either document governs customers' legal or beneficial title to fiat currency deposited to (or otherwise reflected in) their FTX Exchange accounts; (ii) whether and when either document was operative with respect to each of Defendants' many FTX Exchange accounts; (iii) whether Defendants agreed to either the "FTX Terms of Service" or "FTX.US User Agreement" (and if so, which iterations of those documents); and (iv) how the FTX Group treated customers' deposits once they reached bank accounts or cryptocurrency wallets belonging to the FTX Group.  Indeed, Defendants' arguments illustrate that the "FTX Terms of Service" and "FTX.US User Agreement"—and their construction—raise "issues of fact which are not properly resolved on a motion to dismiss."  *Tsai*, 2023 WL 6317742, at *5; *see also In re Millennium Lab Holdings II, LLC*, No. 15-12284, Adv. No. 17-51840, 2019 WL 1005657, at *5 (Bankr. D. Del. Feb. 28, 2019) (finding that defendants' arguments—even when based on documents "referenced in the Complaint," which is not the case here—"simply raises a factual issue, not to be decided on a motion to dismiss").

*First*, the provisions of the "FTX Terms of Service" and "FTX.US User Agreement" on which Defendants base their argument that the "assets at issue were *not* property of Plaintiffs," Mirana Br. at 28 (emphasis in original), on their face purport to address only "[t]itle" to *digital assets*—not fiat currency.  Specifically, the "FTX Terms of Service" state, in part, that "[t]itle to your *Digital Assets* shall at all times remain with you and shall not transfer to FTX Trading."  FTX Terms of Service at 11 (emphasis added); *see* FTX Terms of Service at 29 (defining "Digital Asset" to exclude fiat currency).  Similarly, the "FTX.US User Agreement"

states, "[t]itle to *cryptocurrency* represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US."[6]  FTX.US User Agreement at 3 (emphasis added); *see also* Mot. at 26 (citing these provisions).  Defendants cite no provision of either document that governs title to *fiat currency* "held" or "represented" in their accounts.  Thus, neither document offers any support for the notion that Defendants ever held "title" to any fiat currency "held" or "represented" in their accounts.

        *Second*, although Defendants argue that the respective documents constituted the applicable agreement between customers and FTX US and FTX.com, the documents on their face do not support those assertions, which are not consistent with the allegations of the Complaint.  According to the "FTX Terms of Service" cited by certain Defendants, the terms contained therein would have been applicable to FTX.com Exchange accounts, if at all, starting May 13, 2022—the date that appears on the document.  But Plaintiffs allege (and Defendants do not dispute) that certain Defendants opened FTX.com accounts *before* May 13, 2022.  Specifically, the Complaint alleges that "Mirana first opened an account on the FTX.com exchange in September 2021," Compl. ¶ 46.  The "FTX Terms of Service" document says nothing of any "agreement" that may have been applicable for any time prior to May 13, 2022, and Defendants do not argue that the "FTX Terms of Service" applied retroactively to Defendants' accounts (or to any deposits made to such accounts).

        *Third*, Defendants contend that none of their assets were "the property of, or shall or may be loaned to, FTX."  Mirana Br. at 8; Time Research Br. at 6; Individual Defs Br. at 4 ("The FTX US Terms of Service likewise expressly provided that 'title to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to

---

[6]      The Debtors reserve all rights with respect to the applicability and interpretation of any FTX terms of service or user agreements with respect to digital assets as well as fiat currency, which are outside the scope of these Motions.

FTX.US.'"").  There is no basis for this assertion, which is wrong.  Defendants ask this Court to accept as true their disputed interpretation of FTX Group documents and characterization of how the FTX Group operated.  But, as the allegations of the Complaint make clear—which this Court must accept "as true" at this stage—the reality was very different.  These disputed factual issues are not appropriately considered at the motion to dismiss stage.

Moreover, the FTX Group's operations were characterized by "a complete failure of corporate controls."  Compl. ¶ 37; First Day Decl. at 2.  It is undisputed that FTX Insiders used these control weaknesses—and their total control over the FTX Group—to perpetrate a massive fraud.  Compl. ¶ 39; First Ray Report at 9.  The FTX Insiders' misappropriation and misuse of assets began the moment those assets came into the FTX Group's control, when customer deposits of fiat currency were funneled through bank accounts of Alameda and other affiliates, and cryptocurrencies deposited to FTX Group-controlled wallets were commingled with other assets and misused.  Second Ray Report at 10-15; Disclosure Statement at 16, 50-51.  As is now a matter of public record, the FTX Group commingled and misused vast sums of customer and corporate funds.  Second Ray Report at 10-15.  In short, the FTX Group made no meaningful distinction between customer deposits and Alameda assets.  *Id.*

The notion that Defendants were simply withdrawing "their" assets is therefore wrong.  As the Complaint alleges, in connection with his guilty plea, Wang admitted that in 2019 he made "certain changes to [the FTX.com] code" to give "Alameda Research" "special privileges on the FTX platform."  Plea Tr. 24:6-10, ECF No. 21, *United States* v. *Wang*, 22-cr-00673 (S.D.N.Y. 2022).  As Ellison explained, these "special privileges" allowed "Alameda [to] borrow[] funds that FTX's customers had deposited onto the exchange."  Plea Tr. 27:17-18, ECF No. 19, *United States* v. *Ellison*, 22-cr-00673 (S.D.N.Y. 2022) ("Ellison Plea Tr.") (emphasis added).  By

November 8, 2022, the FTX Group no longer had enough funds to fulfill customer withdrawals, *see* Compl. ¶ 44, regardless of what balances were shown in any customer's account. In other words, by the Petition Date, far from being "theirs," the assets that customers tried to withdraw often did not exist or were indistinguishable from other assets, due to the FTX Insiders' extensive commingling and misappropriation. *See id.* To the extent that Plaintiffs transferred assets to FTX Exchange customers in November 2022 in satisfaction of withdrawal requests, a substantial portion of those assets had been transferred to Plaintiffs by Alameda from other sources as part of the FTX Insiders effort to stem the "run on the bank" by satisfying the pending withdrawals.

These (and other) disputed factual issues illustrate precisely why Defendants' arguments and the extrinsic documents on which they rely cannot be a basis for dismissal.[7]

## III.    SECTIONS 542, 547 AND 548 OF THE BANKRUTPCY CODE APPLY EXTRATERRITORIALLY.

Courts use a two-step framework to determine if a statute applies extraterritorially. *See Abitron Austria GmbH* v. *Hetronic Int'l, Inc.*, 600 U.S. 412, 417-18 (2023). A court first must determine if "Congress has affirmatively and unmistakably instructed that the provision at issue should apply to foreign conduct." *Id.* (internal quotation marks and citations omitted). If Congress has not done so, a court must determine if the particular claims at issue seek a permissible domestic application of the provision by "identifying the focus of congressional concern underlying the provision at issue," looking to "the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate," and asking "*whether the conduct relevant to that focus* occurred" in the United States. *Id.* at 418.

---

[7]     For these reasons, the Court should disregard Defendant Time Research's argument that the transfers were not made on account of an antecedent debt because the transfers "consisted of property belonging to Time Research." Time Research Br. at 29 (referencing the "FTX Terms of Service").

Defendants Mirana and Time Research contend that Plaintiffs' claims for fraudulent and preferential transfers under 11 U.S.C. §§ 547 and 548 must fail because these provisions cannot be exercised extraterritorially. Mirana Br. at 21-23, Time Research Br. at 15-18. This is wrong as a matter of law.

Defendants fail to note that *every* case in this Circuit, as well as the only Circuit Court to have considered the issue, have uniformly rejected Defendants' arguments. *See In re French*, 440 F.3d 145, 152 (4th Cir. 2006) ("Congress . . . demonstrated an affirmative intention to allow avoidance of transfers of foreign property that, but for a fraudulent transfer, would have been property of the debtor's estate"); *In re Maxus Energy Corp.*, 641 B.R. 467, 562 (Bankr. D. Del. 2022) ("The Trustee can seek recovery under § 548 extraterritorially to claw back" the transfers); *In re FAH Liquidating Corp.*, 572 B.R. 117, 125 (Bankr. D. Del. 2017). The law is clear: "Congress' intent was to extend the scope of [the avoidance statutes] to cover extraterritorial conduct." *In re FAH Liquidating Corp.*, 572 B.R. at 124.

Cases adopting this rule have reasoned that although the text of sections 547 and 548 do not explicitly state that they apply extraterritorially, the "surrounding provisions of the Bankruptcy Code" clearly evidence that "Congress nevertheless intended that statute to apply extraterritorially." *Id.* at 125; *see also Morrison* v. *Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010) ("Assuredly context can be consulted as well" in evaluating Congressional intent for extraterritorial application). The Bankruptcy Code defines the bankruptcy estate to be composed of specified categories of property "wherever located and by whomever held," including "[a]ny interest in property that the trustee recovers" under Section 550, which authorizes recovery of transfers avoided under Sections 547 and 548. 11 U.S.C. §§ 541(a) & (a)(3). "Through this incorporation" into Sections 547 and 548 of Section 541's definitions of "property" that the

Trustee can recover using the avoidance powers, "Congress made manifest its intent that [these provisions] apply to all property that, absent a prepetition transfer, would have been property of the estate, wherever that property is located." *In re French*, 440 F.3d at 152.  Indeed, it is difficult to imagine a broader statutory definition of estate property than property "wherever located and by whomever held."  11 U.S.C. § 541(a).

"Because the purpose of the avoidance provision[s] is to preserve the property includable within the bankruptcy estate—the property available for distribution to creditors— 'property of the debtor' subject to the [the avoidance] provision[s] is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier* v. *I.R.S.*, 496 U.S. 53, 58 (1990).  Section 541 details what such property includes.  *See id.* at 58–59.  By defining estate property to include property "wherever located and by whomever held," including property subject to avoidance, Congress clearly expressed its intent for Section 547 and Section 548 to have extraterritorial application.  Thus, it is irrelevant that Congress did not repeat itself in the text of Sections 547 and 548 themselves.  *See Sec. Investor Prot. SIPA Liquidation Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*, 480 B.R. 501, 528 (Bankr. S.D.N.Y. 2012) (Sections 547 and 548's "reference to the 'interest of the debtor in property'—the same term used in Section 541—is not coincidental.").

Defendants' arguments to the contrary rely largely on cases from outside this Circuit.  Mirana Br. at 22-23; Time Research Br. at 18.  This Court and others have explicitly rejected the argument, made by Mirana and Time Research here, that Section 541 and Sections 547 and 548 should be read independently.  Those courts have correctly reasoned that Section 541(a)(3) "provides that any interest in property that the trustee recovers under section 550 becomes property of the estate," and Congress could not have intended "that property located

anywhere in the world could be property of the estate once recovered under section 550, but that a trustee could not avoid the fraudulent transfer and recover that property if the center of gravity of the fraudulent transfer were outside of the United States." *In re Lyondell Chem. Co.*, 543 B.R. 127, 154-55 (Bankr. S.D.N.Y. 2016).

The rule that Mirana and Time Research urge this Court to adopt would undermine the *in rem* jurisdiction of the Bankruptcy Court by removing from its jurisdiction "assets that Congress has declared become property of the estate when recovered under section 541(a)(3)," including fraudulently transferred assets. *In re FAH Liquidating Corp.*, 572 B.R. at 126; *see also In re Simon*, 153 F.3d 991, 996 (9th Cir. 1998) ("The court's exercise of 'custody' over the debtor's property, via its exercise of in rem jurisdiction, essentially creates a fiction that the property—regardless of actual location—is legally located within the jurisdictional boundaries of the district in which the court sits.").

There is no reason to conclude, as Mirana and Time Research suggest, that "property not in the estate as of the commencement of the case cannot be brought into the estate because it is in a foreign locale." *In re Lyondell Chem. Co.*, 543 B.R. at 154. This view is inconsistent with common sense, the plain text of Sections 541(a) and (a)(3), and with "the purpose of the Bankruptcy Code's avoidance provisions, which is to prevent debtors from illegitimately disposing of property that should be available to their creditors." *In re French*, 440 F.3d at 152.

## IV. THE COMPLAINT ADEQUATELY PLEADS FRAUDULENT TRANSFERS UNDER FEDERAL AND STATE LAW.

Defendants contend that Plaintiffs have insufficiently pled fraudulent intent with respect to withdrawals made by Mirana and Time Research. Mirana Br. at 29-31; Time Research Br. at 23-28. But this contention is premised on mischaracterizations of the law and ignores the straightforward allegations of the Complaint.

To state a claim for intentional fraudulent transfer, Plaintiffs need only allege that the transfers were made with the actual intent to hinder, delay, or defraud their present or future creditors. *In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *2; *In re Syntax-Brillian Corp.*, No. 08-11407, Adv. No. 10-51389, 2016 WL 1165634, at *5 (Bankr. D. Del. Feb. 8, 2016). Contrary to Defendants' suggestion that allegations of fraudulent intent must be pled with particularity (Time Research Br. at 23), it is well-settled that fraudulent intent in this context "may be pled generally." *Millennium Lab Holdings*, 2019 WL 1005657 at *3. Moreover, because an independent debtor-in-possession (as Plaintiffs are here) is a third-party outsider to the debtor's prior transactions, "[t]he requirements of Rule 9(b) are relaxed and interpreted liberally where [an independent debtor-in-possession] . . . is asserting the fraudulent transfer claims." *In re Fedders N. Am., Inc.*, 405 B.R. 527, 544 (Bankr. D. Del. 2009); *see also In re Enron Corp.*, 328 B.R. 58, 73-74 (Bankr. S.D.N.Y. 2005) (finding independent debtors-in-possession subject to relaxed application of Rule 9(b)).

Plaintiffs allege that the FTX Insiders engaged in a fraudulent scheme to misappropriate customer funds while seeking to maintain the public perception of legitimacy and solvency, and that the transfers to Mirana and Time Research were executed with the intent to further and prolong that fraudulent scheme. Compl. ¶¶ 49-51. When read in the light most favorable to Plaintiffs, these allegations sufficiently plead fraudulent intent. *Roe* v. *Diamond*, 519 F. App'x 752, 756 (3d Cir. 2013) (the Court must "accept as true all well-pled allegations and construe the complaint in the light most favorable to the non-moving party."). Indeed, it is well-established that transfers "driven by a desire to stay in business," or made to "create a façade that [the] Debtor was running a successful business," support an inference of actual fraud. *In re*

*Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 664, 667 (7th Cir. 2013); *see also Drivetrain, LLC* v. *X. Com., Inc.*, No. 22-50448, Adv. No. 22-50448, 2023 WL 1804627, at *1, *4.

Defendants also wholly fail to acknowledge the larger fraudulent scheme alleged in the Complaint, of which the transfers to Mirana and Time Research are part and parcel.  Instead, Defendants focus on the so-called "badges of fraud" analysis, but this argument "confuses the forest for the trees." *Drivetrain*, 2023 WL 1804627, at *3.  In determining whether allegations support an inference of actual intent to defraud, the Complaint must be read in its entirety.  *In re Live Well Financial Inc.*, 652 B.R. 699, 707 (Bankr. D. Del. 2023) (holding that "[i]n its analysis, the court will look to the totality of the circumstances" and finding that "[r]eading the Complaint in its entirety leads to the reasonable inference" of intent to hinder, delay, or defraud creditors); *see also In re Syntax-Brillian Corp.*, 2016 WL 1165634, at *6 (finding that under the "totality of the circumstances," the factual pleadings "allow the Court to draw the reasonable inference that the Debtors incurred the Obligations with the actual intent to delay, hinder, or defraud").

Where, as here, "the plaintiff makes specific factual allegations, in a non-conclusory fashion, of a [debtor]'s actual intent to defraud its creditors," badges of fraud "are essentially beside the point." *Drivetrain*, 2023 WL 1804627, at *3.  As described below, the Complaint more than adequately alleges that (i) the FTX Insiders actually intended to defraud creditors when they transferred funds to Mirana and Time Research and, (ii) in any event these transfers involved sufficient "badges of fraud" from which to infer the FTX Insiders' actual intent to hinder, delay or defraud creditors.

### A.    The Complaint Directly Alleges Actual Fraudulent Intent, Rendering "Badges of Fraud" Unnecessary.

The FTX Insiders indiscriminately siphoned customer funds from the FTX exchange for personal use.  By June of 2022, the FTX Insiders, via Alameda, had borrowed several

billions in customer funds.  Compl. ¶ 44; Plea Tr. at 28-29, *United States* v. *Singh*, No. 22-cr-673
(Mar. 24, 2023) ("Singh Plea Tr.").  The FTX Insiders knew they had built a house of cards, and
as they careened towards collapse, they took pains to project a false image of stability and
profitability—including by falsifying balance sheets and other financial records.  Compl. ¶¶ 41,
45; Superseding Indictment of Samuel Bankman-Fried ("Superseding Indictment") ¶¶ 12-13,
*United Sates* v. *Bankman-Fried*, No. 22-cr-673 (S.D.N.Y. 2022), ECF No. 115; Singh Plea Tr. at
29-31.

       Even on November 7, 2022, after news of the FTX Group's financial condition
triggered a full-blown liquidity crisis, Bankman-Fried doubled down, tweeting:  "FTX has enough
to cover all client holdings.  We don't invest client assets (even in treasuries).  We have been
processing all withdrawals, and will continue to be."  Superseding Indictment ¶ 54; Compl. ¶ 51.
These were total lies.  In reality, the FTX Insiders knew that, given the extent of their fraud,
covering *all* client holdings would be impossible; unless the FTX Insiders could stave off further
scrutiny and raise billions to replace the billions they had squandered, they knew the liquidity crisis
would expose the extent of their fraudulent scheme.  *See* Compl. ¶ 45 ("[N]ow that it's actually
happening it just feels great to get it over with[,] one way or another.").

       The FTX Insiders prioritized processing withdrawals for Mirana and Time
Research ahead of other withdrawals in an attempt to prolong their fraudulent scheme.  By proving
to influential crypto industry "VIPs" like Mirana and Time Research that FTX could still process
large withdrawal requests, the FTX Insiders hoped not only to bolster Bankman-Fried's
contentions that reports of FTX's insolvency were false "rumors," but also, to preserve FTX's
reputation in the crypto industry during a time when Bankman-Fried and other Insiders were
scrambling to raise funds, "effectively buying silence by prioritizing withdrawals."  Compl. ¶ 51

(FTX Group "actively monitor[ed] public statements by other cryptocurrency industry participants, including Bybit and affiliated entities, and prioritized Mirana's requests in an effort to pacify a major industry participant"); Superseding Indictment ¶ 8 ("in a last-ditch effort to satisfy FTX customer withdrawals [SBF] doubled down on his fraudulent schemes by soliciting billions of dollars in additional capital investments").  These allegations adequately plead intent to hinder, delay, or defraud creditors.  *See Drivetrain, LLC,* 2023 WL 1804627, at *4 (finding that incurring obligations in order to project a false image of profitability to investors and other creditors was, "as a matter of ordinary English . . . one in which the debtor sought to defraud its creditors").  Moreover, "if the natural consequence of a debtor's action is to hinder, delay or defraud creditors, a court may infer an intentional fraudulent conveyance."  *In re Millennium Lab Holdings II, LLC,* 2019 WL 1005657, at *3 (cleaned up).  Moving Mirana and Time Research to the head of the withdrawal line, ahead of other, non-"VIP" customers, easily meets this standard.

For this reason, the Defendants' reliance on the out-of-circuit decision in *Sharp International Corp.* v. *State Street Bank & Trust Co.*, 403 F.3d 43 (2d Cir. 2005), is misplaced.  *See* Mirana Br. at 29.  Unlike the transactions here, the *Sharp* decision involved the repayment of a routine loan that plaintiffs inadequately alleged was connected to the larger fraud at issue in the bankruptcy.  *Id.* at 56 (holding that "[t]he fraud alleged in the complaint relates to the manner in which Sharp obtained new funding from the Noteholders, not" the loan repayment).  As described above, the transactions here formed part and parcel of the FTX Insiders' fraudulent scheme, and were a necessary step to further prolong the scheme.[8]

---

[8]     Courts have held that *Sharp* is inapposite where, as here, a "Plaintiff sufficiently ties [a] Debtor's fraudulent intent to the specific transfers at issue."  *In re Live Well Fin., Inc.*, 652 B.R. at 707.

B.    **The Complaint Also Alleges "Badges of Fraud" That Support an Inference of Fraudulent Intent.**

Even if it were necessary to consider whether the transactions here were tainted by "badges of fraud," Plaintiffs' well-pled allegations point to multiple badges that this Court has found sufficient to plead actual intent to defraud.

Defendants argue, at length, that Plaintiffs fall short of alleging "badges of fraud" sufficient to support an inference of actual intent to defraud, and posit that "[a] single badge of fraud is insufficient to establish a claim." Mirana Br. at 30. Not only is this incorrect; it is beside the point. It is well-settled that "[i]dentifying badges of fraud is just one substitute for direct evidence . . . [a]nd a court may consider other factors when analyzing a debtors' intent." *In re Live Well Financial Inc.*, 652 B.R. at 705. In contrast to Defendants' rote recitation of these so-called badges, courts have held that "[t]he badges-of-fraud analysis is not a check-the-box inquiry, and a court may consider other factors relevant to the alleged fraudulent transaction." *In re Syntax-Brillian Corp.*, 2016 WL 1165634, at *5; *see also In re Tribune Co*., 464 B.R. 126, 162 (Banrk. D. Del., 2011) ("A court may, of course, consider factors other than the traditional badges of fraud in an analysis of fraudulent intent," for instance, "[i]f the 'natural consequence' of a debtor's actions is that its creditors were hindered, delayed or defrauded.") (citing *United States* v. *Tabor Court Realty Corp*., 803 F.2d 1288, 1305 (3d Cir. 1986)). The absence of any particular "badges" do not detract from Plaintiffs' well-pled allegations, and the badges Plaintiffs *have* alleged support an inference of actual intent to defraud.

Here, Plaintiffs have alleged at least three badges of fraud: (i) that the transfers were facilitated by the close relationship between Plaintiffs and Time Research and Mirana, (ii) that Plaintiffs were insolvent when the transfers were made, and (iii) that the transfers occurred shortly before or after Plaintiffs incurred substantial debts.

-38-

1.      **Mirana and Time Research's VIP status underscored their close relationship with FTX.**

Defendants argue that because Plaintiffs have not alleged that Mirana or Time Research was an "insider," the Complaint fails to allege a "close relationship" that may support an inference of actual intent to hinder, delay, or defraud.  Mirana Br. at 31-33; Time Research Br. at 25-26.

The transfers to Mirana and Time Research were made in furtherance of a larger fraudulent scheme, and each badge of fraud alleged must be interpreted in light of that larger scheme.  *In re Direct Access Partners, LLC*, 602 B.R. 495, 544 (Bankr. S.D.N.Y., 2019) ("[E]ach alleged 'badge of fraud' must be judged in the context of other evidence and in light of what reasonable implications can be drawn from it in a particular case.").  Plaintiffs have alleged that the FTX Insiders had a "close relationship" to Mirana and Time Research to the extent that the FTX Insiders regarded the two users as crypto-industry "VIPs", and treated them accordingly.  Compl. ¶¶ 47, 50-52.  Indeed, Mirana employees had a "private Telegram group," used as a "direct line of communication . . . for quicker support on any issues [they] may have," including use in processing slowed withdrawals during the liquidity crunch in November 2022.  *See* Compl. ¶¶ 47, 50-51.  These well-pled allegations support an inference of actual intent to defraud creditors when viewed in the context of the larger scheme, and at this stage, it is premature to evaluate disputed issues of material fact and weigh credibility.  *In re 45 John Lofts, LLC*, 650 B.R. 602, 614 (Bankr. S.D.N.Y. 2023) (a "close link between the[] parties and their pattern of doing business together is another badge of fraud that supports a finding that the transfer was fraudulent").

2.      **FTX.com was hopelessly insolvent when the transfers were made.**

The Complaint clearly alleges that FTX.com was insolvent when the transfers at issue were made, and there is no dispute that this is a badge of fraud.  *See, e.g.*, *In re PennySaver*

*USA Publ'g, LLC*, 602 B.R. 256, 273 (Bankr. D. Del. 2019).  Ellison admitted that beginning in 2019, the FTX Insiders "allowed Alameda to 'borrow' billions of dollars from FTX.com."  Compl. ¶ 43.  Singh admitted that "by September 2022," Alameda "could not repay what it owed."  *See* Singh Plea Tr. at 28:23-29:3.  On top of this, FTX Insiders admitted to widespread misconduct and record falsification, through which the FTX Insiders sought to cover up the growing liquidity crisis.  Ellison Plea Tr. at 28:10-12 ("I agreed with Mr. Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders."); Singh Plea Tr. at 29:13-19 ("I took actions to make it appear that FTX's revenues were higher than what they were" . . . [and] provided that misleading information to auditors.").

These well-pled allegations point to the fact that the pre-petition Plaintiffs failed to "properly account for their assets and liabilities" and were insolvent when the relevant transfers were made.  *In re DBSI*, 447 B.R. 243, 248 (Bankr. D. Del. 2011) (improper accounting probative of insolvency); *see* Compl. ¶ 37; *see also* First Day Declaration ¶ 56-57 (expressing concern with reliability of purportedly audited financial statements, and noting the lack of availability of audited financial statements).  At this stage, these allegations are assumed to be true and viewed in the light most favorable to Plaintiffs.  *See In re PennySaver USA Publ'g, LLC*, 602 B.R. at 270 ("Insolvency is best left to discovery to determine and should not generally be decided on a motion to dismiss.").

### 3. Plaintiffs incurred substantial debts around the time the transfers were made.

Similarly, the transfers to Time Research and Mirana were made "shortly before or shortly after a substantial debt was incurred."  *In re Mallinckrodt PLC*, No. 20-12522, Adv. No. 22-50433, 2024 WL 206682, at *27 (Bankr. D. Del. Jan. 18, 2024).  As alleged in the Complaint, following the revelation of Alameda's insolvency, "substantial numbers of FTX.com and FTX US

customers began withdrawing funds from the exchange." Compl. ¶ 49. FTX.com employees raced to process these withdrawal requests while "the FTX.com exchange could still meet" them. Compl. ¶ 50. Ultimately, the bank run forced FTX.com to halt withdrawals, leaving unprocessed millions of additional customer requests, including those of Mirana. Compl. ¶ 54.

Accordingly, Plaintiffs have adequately alleged direct evidence of an intent to hinder, delay, or defraud creditors, as well as multiple badges of fraud giving rise to an inference of an intent to defraud.

## V.    THE COMPLAINT PROPERLY PLEADS A TURNOVER CLAIM.

Defendant Bybit challenges Plaintiffs' well-plead turnover claim with respect to the assets held in the Bybit Accounts by imploring this Court to dismiss the claim in favor of an unpled arbitration agreement, for failure to join "necessary" parties, or otherwise for failure to state a claim upon which relief can be granted. As explained below, each argument is without merit.

### A.    Plaintiffs Have Adequately Pled a Claim for Turnover.

A properly pled claim for turnover of estate property must "allege an undisputed right to recover the claimed debt." *In re Am. Home Mortg. Holding*, 458 B.R. 161, 169 (Bankr. D. Del. 2011). The Complaint alleges that "the assets held by Bybit in the Bybit Accounts are property of the Debtors' estates" subject to turnover under Section 542 because "[t]here is no bona fide dispute as to the Debtors' ownership of the more than $125 million in assets in the Bybit Accounts." Compl. ¶¶ 70-71, 73.

The Bankruptcy Code defines "property of the estate" as "all legal or equitable interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held." 11 U.S.C. § 541(a). Accordingly, courts have uniformly held that the scope of a debtor's property interest is "broad." *See, e.g.*, *United States* v. *Whiting Pools, Inc.*, 462 U.S. 198, 205 (1983); *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 211 (3d Cir. 2006) ("[T]he term

'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed.") (internal citation omitted); *Integrated Sols., Inc.* v. *Serv. Support Specialties, Inc.*, 124 F.3d 487, 490 (3d Cir. 1997) ("[T]he purpose of section 541 was to move away from the complicated melange of references to State law, and to determine[ ] what is property of the estate by a simple reference to what interests in property the debtor has at the commencement of the case.") (internal citation omitted).  Given the broad scope of a debtor's property interest, "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of [Section] 541." *In re Culp*, 588 B.R. 389, 393–94 (Bankr. D. Del. 2018) (finding that even a "contingent and residual interest" in insurance policy proceeds properly constituted "property of the estate").

The Complaint clearly alleges that all six Bybit Accounts were "funded and controlled by, and used solely for the benefit of, the Debtors and their subsidiaries."  Compl. ¶ 69.  The Complaint further alleges that the accounts were formed "at the direction of FTX Group employees to be used for Alameda's trading activities" and that "the email addresses associated with each of the corresponding Bybit accounts were set up to automatically forward all messages to info@alamedaresearch.com, or used info@alameda-research.com as the recovery e-mail address."  *Id.*  Indeed, the Debtors can still access these accounts, but cannot withdraw the assets therein as a result of Bybit's self-serving interference with them.  Compl. ¶ 69.

Plaintiffs accordingly have an enforceable property interest in the Bybit Accounts based on their funding, use of, and ultimate control over those accounts.  Recognizing the breadth of Section 451, courts have held that even accounts nominally held under the names of other entities constitute "property of the estate" and are subject to turnover where debtors "controlled" the accounts.  *In re Schwartz*, No. 10-21505, Adv. No. 12-01344, 2014 WL 2621114, at *5 (Bankr.

D.N.J. June 12, 2014) (holding that a bank account not in the debtor's name was nevertheless property of the estate where the debtor funded the account, showed "ownership, control, and interest" in the account, and the money "functionally belonged" to the debtor); *In re Veluchamy*, 879 F.3d 808, 818 (7th Cir. 2018) (affirming the bankruptcy court's finding that turnover of assets nominally held in a bank account nominally titled in a separate foreign entity's name was appropriate because debtor "controlled" the assets); *In re Dordevic*, 67 F.4th 372, 387 (7th Cir. 2023) (finding that turnover was appropriate where the debtor contributed all the funding for a property interest, although the property interest was itself held nominally by another person).

Defendant Bybit's strained arguments to try to manufacture a "dispute" do not change this outcome and are entirely based on its erroneous assertion that Plaintiffs' turnover claim to recover assets from its Bybit accounts "is essentially a claim that Bybit breached its Terms and Conditions." Bybit Br. at 20. *See* Bybit Br. at 15-20, Shamah Decl., Ex. 1 (the "Alleged Bybit Terms and Conditions"). But, as discussed, the Complaint does not assert a claim for breach of contract or any other claim based on the Alleged Bybit Terms and Conditions. Bybit attempts to reformulate Plaintiffs' theory of its own case into an unpled strawman contract dispute. *See* Bybit Br. at 18, 20. This attempt fails for several reasons.

*First*, the well-pled allegations in the Complaint must be accepted as true, with all reasonable inferences drawn in the Plaintiffs' favor on a motion to dismiss. *Black*, 835 F.3d at 364 (3d Cir. 2016); *see also Am. Eagle Outfitters, Inc.* v. *Lyle & Scott Ltd.*, No. 06-607, 2007 WL 1202760, at *3 n.4 (W.D. Pa. Apr. 12, 2007) ("Allowing the Defendants to reformulate [Plaintiff]'s causes of action . . . would be inconsistent with both, (a) the rule that the Plaintiff is the master of its complaint, and (b) the court's obligation to take [Plaintiff]'s allegations as true and construe facts in its favor."). As discussed above, the Complaint unambiguously alleges that "the assets

held by Bybit in the Bybit Accounts are property of the Debtors' estates" amenable to turnover

under Section 542 because "[t]here is no bona fide dispute as to the Debtors' ownership of the

more than $125 million in assets in the Bybit Accounts."  Compl. ¶¶ 70–71, 73; *Miller* v. *Mott*,

No. 23-50004, 2023 WL 6467368, at *6 (Bankr. D. Del. Oct. 4, 2023) ("A motion to dismiss . . .

tests the validity of the complaint *as pled.*") (emphasis added).  Plaintiffs' theory of their own case

controls.[9]

       Because Plaintiffs' theory of ownership is based on its control over the six Bybit

Accounts, Compl. ¶ 69, Bybit's reliance on a factually dissimilar case, *In re Lexington Healthcare*

*Grp., Inc.*, 363 B.R. 713 (Bankr. D. Del. 2007), is unavailing.  Bybit Br. at 22.  In *Lexington*

*Healthcare*, Debtor Lexington Healthcare Group sought turnover of a security deposit paid to a

nursing home under a lease contract.  363 B.R. at 714.  Lexington Healthcare Group's alleged right

to the security deposit under the lease necessarily depended on the governing provisions of the

lease contract.  *In re Lexington Healthcare Grp., Inc.*, 363 B.R. at 716.  The court determined that

Lexington Healthcare Group improperly sought to use Section 542 as a remedy to liquidate what

was intrinsically a contract dispute.  *See id.* at 716-17.  Here, *Lexington Healthcare* is inapplicable

because the Complaint never alleges, as Defendants contend, that "Bybit improperly failed to

fulfill withdrawal requests . . . in accordance with Bybit's Terms and Conditions."  Bybit Br. at

18.  Instead, the Complaint alleges a theory of Debtor-Plaintiff ownership of the six Bybit

Accounts based on Plaintiffs' ultimate control over them.  Compl. ¶ 69.  Bybit's revision of the

Complaint's factual allegations in an effort to manufacture an unpled contract dispute cannot form

a basis for dismissal under Rule 12(b)(6).  *In re Digital Networks N. Am., Inc.*, No. 15-11535, Adv.

---

[9]     For this reason, Bybit's contention that Plaintiffs lack standing to assert a turnover claim with respect to the assets in the Bybit Accounts misses the mark.  A Plaintiff has standing where they have a "personal stake in the outcome of [] matters" concerning property of the estate.  *In re 1031 Tax Grp., LLC*, 420 B.R. 178, 195 (Bankr. S.D.N.Y. 2009).

No. 50900, 2018 WL 3869599, at *6 (Bankr. D. Del. Aug. 13, 2018) (rejecting *Lexington Healthcare* because there was no need to engage in contractual interpretation when the facts alleged in the complaint sought turnover under a separate basis); *In re APF Co.*, Nos. 98-1596, 00-854, 2001 WL 1820788, at *7 (D. Del. Aug. 31, 2001) ("Plaintiffs are entitled to submit evidence to establish that the withheld [property] is property of [its] estate.").

*Second*, courts should not consider extrinsic documents on a motion to dismiss and instead should "consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record" and documents that are integral to or explicitly relied on by the complaint.  *Schmidt* v. *Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citation omitted).  Here, the Alleged Bybit Terms and Conditions are extraneous and not integral to the Complaint because (i) the Complaint never cites, relies upon, nor makes any reference to the Alleged Bybit Terms and Conditions, and (ii) the Alleged Bybit Terms and Conditions are entirely irrelevant to Plaintiffs' stated theory of relief based on Plaintiffs' control over the Bybit Accounts.  *Glob. Network Commc'ns, Inc.* v. *City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (finding that materials "neither mentioned nor relied upon by appellant in drafting its complaint" were not integral to the complaint); *In re Nortel Networks Inc.*, 545 B.R. 469, 477 (Bankr. D. Del. 2016) (declining to consider an extrinsic contract because contract was never referenced in the complaint and plaintiff's claims for relief did not rely on the contract); *In re Digital Networks N. Am., Inc.*, No. 15-11535, Adv. Pro. No. 17-50900, 2018 WL 3869599, at *6 (Bankr. D. Del. Aug. 13, 2018).

The requirement to adhere to the allegations of the Complaint at the motion to dismiss stage is particularly important in the turnover context.  *In re Celsius Network LLC*, 2022 WL 17541051, at *6 (Bankr. S.D.N.Y. Dec. 8, 2022) (finding that it is "clearly impermissible" for defendants to "rely entirely on allegations outside the [complaint] to manufacture a dispute over

title"). In *In re Celsius Network LLC*, defendants sought to introduce a profit-sharing agreement to rebut plaintiff's theory of ownership in Celsius coins. *Id.* at *3–4. The *Celsius* court refused to consider defendants' extrinsic contract and explained that "adopting Defendants' arguments would provide an easy-out for any party defending a section 542 claim." *Id.* at *7. According to the *Celsius* court, the defendant's arguments based entirely on extraneous documents, if adopted, would enable all future turnover defendants to immunize themselves from Section 542 liability by "creat[ing] a 'dispute'" that would function to "disqualify the section 542 claims from being heard in a bankruptcy court, regardless of merit." *In re Celsius Network LLC*, 2022 WL, at *4 (citing *In re Legal Xtranet*, No. 11-51042, Adv. Pro. No. 11-5068, 2011 WL 3236053, at *1 n.1 (Bankr. W.D. Tex. July 26, 2011) ("[T]he Defendant cannot resist section 542(b) by *manufacturing* a dispute where there in fact is none . . . simply resisting recovery is not enough to create a legitimate dispute.") (emphasis in original)). The court in *Celsius* stated that "defendants simply cannot insert their own factual allegations at the motion to dismiss stage to create a dispute." *Id.* at *7. Applying the reasoning in *Celsius*, the Court should reject Bybit's attempt to manufacture a contractual dispute by inserting its own extrinsic document.

      *Third*, even if the Court were to consider the Alleged Bybit Terms and Conditions, they do not provide an independent basis for dismissal because they raise numerous fact-intensive questions (*e.g.*, enforceability, construction, and ambiguity determinations) that are not appropriate for resolution at this stage. *In re Oakwood Homes Corp.*, 342 B.R. 59, 69 (Bankr. D. Del. 2006) (finding that contract interpretation is generally "an issue of fact that is inappropriately resolved on a motion to dismiss"); *Seaport Inlet Marina, LLC* v. *Connell*, No. 17-1908, 2017 WL 3981128, at *5–7 (D.N.J. Sept. 11, 2017) (finding "any determination of enforceability [of a

contract] is premature" on a motion to dismiss "without the benefit of a more complete evidentiary record").

In any event, the Alleged Bybit Terms and Conditions do not say who ultimately retains a property interest in the Bybit Accounts and, thus, the Alleged Bybit Terms and Conditions bear no relation to Plaintiffs' asserted basis for relief.  Defendant Bybit selectively quotes various portions of its Alleged Bybit Terms and Conditions to defend its interference with estate property.  *See, e.g.*, Bybit Br. at 17-18 ("Bybit may, in its 'sole discretion, limit, suspend or terminate, or issue a warning to you regarding, the Platform or the Account, including terminating the Account (or certain functionalities thereof such as . . . withdrawing Digital Assets).'").  But Bybit's assertion of an alleged extra-complaint contractual right as a defense to its failure to return estate property does nothing to disturb Plaintiffs' property interest in the Bybit Accounts.  *In re APF Co.*, 264 B.R. 344, 356 (Bankr. D. Del. 2001) ("That a party owing an account may assert a valid defense to payment of the debt is contemplated in § 542(b) and does not require a holding that the debt is not matured.").  Therefore, even if the Court were to consider the Alleged Bybit Terms and Conditions, they are irrelevant to Plaintiffs' stated theory of ownership.

**B.    Bybit's Reference to an Alleged Extraneous "Terms of Service" Does Not Warrant Dismissal at This Stage.**

Further, Bybit's contention that Plaintiffs' turnover claim should be dismissed in favor of arbitration purportedly authorized in a clause contained in the Alleged Bybit Terms and Conditions is wrong.  Bybit Br. at 15-20.

*First*, a turnover claim is a creditor claim arising from the Bankruptcy Code and is not subject to pre-petition arbitration agreements.  *Second*, the Court has discretion to deny arbitration where, as here, arbitration would conflict with the provisions of the Bankruptcy Code.

*Third*, even if the claim were arbitrable, the Court should disregard the Alleged Bybit Terms and Conditions as an extrinsic document.  *See supra* Section V.A.

> **1.** **Plaintiffs' turnover claim is not subject to the alleged arbitration clause.**

Even if this Court could consider Bybit's extraneous Alleged Bybit Terms and Conditions, Bybit's motion to dismiss in favor of arbitration nevertheless fails because a statutory claim arising under the Bankruptcy Code brought for the benefit of the creditors cannot be dismissed in favor of arbitration.  *Hays & Co.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1155 (3d Cir. 1989) (citing *Allegaert* v. *Perot*, 548 F.2d 432, 436 (2d Cir. 1977); *In re Pursuit Cap. Mgmt., LLC*, 595 B.R. 631, 671 (Bankr. D. Del. 2018); *In re AstroPower Liquidating Tr.*, 335 B.R. 309, 325-26 (Bankr. D. Del. 2005); *In re Oakwood Homes Corp.*, No. 02-13396, Adv. Pro. No. 04-56928, 2005 WL 670310, at *3-4 (Bankr. D. Del. Mar. 18, 2005); *In re EXDS, Inc.*, 316 B.R. 817, 826 (Bankr. D. Del. 2004).

In *Hays*, the Third Circuit held that claims arising under the Bankruptcy Code belong to the creditors, who are not parties to any underlying arbitration clause.  *Hays & Co.*, 885 F.2d at 1155.  Because a debtor-in-possession "step[s] into the shoes" of creditors when bringing creditor claims, a debtor-in-possession is not bound by any underlying arbitration clause with respect to creditor claims.  *Id.* at 1155; *accord Allegaert* v. *Perot*, 548 F.2d 432, 436 (2d Cir.1977) (fraudulent and preferential transfer claims "are statutory causes of action belonging to the trustee, not to the bankrupt, and the trustee asserts them for the benefit of the bankrupt's creditors, whose rights the trustee enforces"); *In re EPD Inv. Co., LLC*, 821 F.3d 1146, 1152 (9th Cir. 2016).

Plaintiffs' turnover claim is a cause of action which "the Bankruptcy Code itself authorizes the trustee to assert on the Creditor's behalf."  *In re APF Co.*,  264 B.R. 344, 361-363 (Bankr. D. Del. 2001) (denying Defendants motion to stay adversary proceedings in favor of

arbitration with regard to core bankruptcy claims such as turnover and damages for violations of the automatic stay). A turnover demand is a specifically enumerated power of a trustee. 11 U.S.C. § 542. Accordingly, a turnover claim is by definition a statutory claim based on the Bankruptcy Code brought for the benefit of creditors and cannot be subject to any purported underlying arbitration provision. *Hays & Co.*, 885 F.2d at *1155 ("Claims asserted by the trustee . . . are not derivative of the bankrupt. They are creditor claims that the Code authorizes on their behalf . . . It follows that the trustee cannot be required to arbitrate its [] claims").

Bybit incorrectly asserts that Plaintiff's well-plead turnover claim is in essence a contract dispute regarding whether Bybit properly fulfilled withdrawal requests in accordance with its Alleged Bybit Terms and Conditions. Bybit Br. at 18. However, "allowing the Defendants to reformulate" Plaintiffs' cause of action by reference to extra-Complaint material "would be inconsistent with both (a) the rule that the Plaintiff is the master of its complaint, and (b) the court's obligation to take [Plaintiffs'] allegations as true and construe facts in its favor." *Am. Eagle Outfitters, Inc.* v. *Lyle & Scott Ltd.*, 2007 U.S. Dist. LEXIS 30074, at *9 n.4 (W.D. Pa. Apr. 12, 2007). In any event, Bybit's non-existent "contract claim" is wholly manufactured by Defendant's own actions. By actively preventing Plaintiffs from retrieving property to which they once enjoyed unfettered access after the Petition Date, Defendant Bybit orchestrated a dispute into which it now seeks to hoehorn its "contract" theory. Whether Bybit views its actions as permissible under its alleged terms is inconsequential and irrelevant to Plaintiffs' statutory turnover claim, and the claim is not arbitrable.

## 2.    This Court has discretion to decline enforcement of any arbitration provision.

While the Alleged Bybit Terms and Conditions should be disregarded at this stage, this Court in any event may exercise its discretion to deny arbitration where there is "an inherent

conflict between arbitration and the Bankruptcy Code," such as where the agreement would result in piecemeal litigation in overseas fora, undermining the bankruptcy system that was designed to avoid such dissipation of the estate's resources. *In re Mintze*, 434 F.3d 222, 231 (3d Cir. 2006).

For example, the court in *In re E & G Waterworks, LLC* held that "a turnover demand is a simple, efficient mechanism to collect matured debts currently due to the bankruptcy estate." 571 B.R. 500, 509 (Bankr. D. Mass. 2017). The *Waterworks* court found that requiring arbitration of "turnover demand . . . [would] de-centralize the bankruptcy process [and] would undermine the trustee's power to seek a quick and inexpensive resolution . . . for the benefit of all creditors." *Id.*

The potential unnecessary expenditure of estate resources, and the associated delays in proceedings, will ultimately harm creditors and are fundamentally in conflict with the Bankruptcy Code's preference for centralized, speedy and inexpensive resolutions. *Id.*; *see also In re EPD Inv. Co., LLC*, 821 F.3d 1146, 1150 (9th Cir. 2016) ("[T]he arbitration provisions at issue conflicted with Bankruptcy Code purposes of having bankruptcy law issues decided by bankruptcy courts; of centralizing resolution of bankruptcy disputes; and of protecting parties from piecemeal litigation."); *In re APF Co.*, 264 B.R. 344, 364 (Bankr. D. Del. 2001) (noting that "[o]f primary concern is the preservation of the Debtors' estate by not requiring Plaintiffs to expend limited resources and energies pursuing similar cases in several geographically diverse fora"). Accordingly, even if the Alleged Bybit Terms and Conditions could apply at this stage, the Court should decline to enforce any arbitration provision therein.

### 3.    In the alternative, Plaintiffs should be entitled to discovery regarding the Alleged Bybit Terms and Conditions.

Even if the turnover claim were arbitrable, it is well settled that a court may only dismiss a complaint in favor of arbitration where "the complaint, and the documents it relies on,

make clear that a party's claims are subject to an enforceable arbitration clause." *In re Pursuit Capital Mgmt., LLC*, 595 B.R. 631, 668 (Bankr. D. Del. 2018) (citing *Guidotti* v. *Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3rd Cir. 2013)).  However, "if the complaint and its supporting documents are unclear [about] the agreement to arbitrate, then the parties are entitled to discovery [and] further briefing on arbitrability." *In re Pursuit Capital Mgmt., LLC*, 595 B.R. at 668 (cleaned up).  The Complaint does not cite, attach or reference the Alleged Bybit Terms and Conditions, and Plaintiff's statutory turnover claim is not based on the Alleged Bybit Terms and Conditions.

Indeed, where "the complaint and its supporting documents are unclear regarding the agreement to arbitrate," a court cannot assess the authenticity or import of the arbitration agreement at issue "[w]ithout the benefit of a developed factual record." *Horton* v. *FedChoice Fed. Credit Union*, 688 F. App'x 153, 157 (3d Cir. 2017).  Accordingly, courts in the Third Circuit have routinely denied motions to dismiss in favor of arbitration and instead granted discovery where the complaint makes no reference to an arbitration agreement. *See e.g.*, *Moon* v. *Breathless, Inc.*, No. 15-06297, 2015 WL 7720490, at *3-4 (D.N.J. Nov. 30, 2015) (denying motion to dismiss in favor of arbitration and ordering discovery where the agreement and arbitration provision were not referenced in the complaint or attached thereto and arbitrability is not "apparent on the face of the complaint"); *Tedeschi* v. *D.N. Desimone Constr., Inc*, 2016 U.S. Dist. LEXIS 102209, at *2-3, 16 (D.N.J. Aug. 4, 2016) (denying motion to dismiss in favor of arbitration and ordering discovery where "it is unclear from the face of plaintiffs' complaint that they contractually agreed to have their claims against defendants resolved through arbitration").

**C.     Bybit's Joinder Argument Is Procedurally Improper and Bybit Does Not Carry Its Burden To Dismiss for Failure To Join a Party.**

As another gatekeeping argument, Bybit posits that the turnover claim should be dismissed because the five non-Alameda shell entities that nominally hold Bybit Accounts are necessary parties to the litigation under Federal Rule of Civil Procedure 19.  Bybit Br. at 14.  Bybit moved only under Rules 12(b)(2) and 12(b)(6), and so its purported motion for dismissal for failure to join all necessary parties should be denied as procedurally improper.  Fed. R. Civ. P. 12(b)(7) (a "party may assert the following defenses by motion . . . failure to join a party under Rule 19"); *see Va. College, LLC* v. *Martin*, 2012 U.S. Dist. LEXIS 96425, at *17 (S.D. Miss. July 12, 2012) ("Defendants did not move to dismiss under Rule 12(b)(7) for failure to join a necessary party, did not cite any authority, and did not fully explore their contention.  Therefore this is not properly before the Court.").

Even if Bybit's strained joinder argument were properly before the Court, Bybit does not meet its burden of showing that the five entities it identifies are necessary and indispensable parties to this action.  At every stage, [t]he moving party "bears the burden of showing why an absent party should be joined under Rule 19," by showing the nonparty is necessary and indispensable.  *See Disabled in Action of Pa.* v. *Se. Pa. Transp. Auth.*, 635 F.3d 87, 97 (3d Cir. 2011); *see also Pittsburgh Logistics Sys., Inc.* v. *C.R. England, Inc.*, 669 F.Supp.2d 613, 618 (W.D. Pa. 2009) (citing *Develcom Funding, LLC* v. *Am. Atl. Co., Civ. A.*, No. 09-1839, 2009 WL 2923064, *2 (D.N.J. Sept. 9, 2009)).  However, Bybit does not explain how any non-debtor entity is indispensable to this action.  *Heinzl* v. *Quality Foods Corp.*, No. 14-1010, 2014 WL 6453894, at *10 (W.D. Pa. Nov. 17, 2014) (dismissal not appropriate where jurisdiction premised on a federal question, and defendant did not argue that non-parties were indispensable).

Bybit further makes no attempt to satisfy its burden to show joinder of any of these entities is infeasible. *See* Bybit Br. at 15. Under Rule 19, if a party is necessary, the Court must decide if joining the parties is "feasible"—in other words whether the party can be served and the Court's jurisdiction will not be affected. *See Janney Montgomery Scott, Inc.* v. *Shepard Niles, Inc.*, 11 F.3d 399, 408 (3d Cir. 1993). Beyond arguing in conclusory fashion that the non-debtor entities are "necessary," Bybit fails to articulate in its opening brief a single reason the non-debtor entities it claims should have been joined would not be subject to service of process, or that their joinder would deprive the Court of jurisdiction over this action. As a result, even if the Court found these entities to be necessary parties, it could simply order that they be joined and served with process. *Hubbard* v. *Rite Aid Corp.*, 433 F.Supp.2d 1150, 1158-59 n.3 (S.D. Cal. 2006) (no basis for dismissal under Rule 19(b) where there was no showing that a non-party could not be joined).

Because Bybit fails to meet its burden of showing that the five non-debtor entities are both necessary and indispensable, or that their joinder would be infeasible, Bybit has not established grounds for dismissal under Rule 19(b). Accordingly, the Court should deny the motion, or, in the alternative, order that the entities be joined.

## VI.   DEFENDANTS HAVE VIOLATED THE AUTOMATIC STAY BY FREEZING AND ATTEMPTING TO DEVALUE ESTATE ASSETS.

A violation of the automatic stay pursuant to 11 U.S.C. § 362(a)(3) "requires both (1) a post-petition act; and (2) property of the estate." *Re Extraction Oil & Gas, Inc*., No. 20-11548, Adv. No. 17-51840, 2020 WL 7074142, at *4 (Bankr. D. Del. Dec. 3, 2020). With respect to the estate assets held hostage on the Bybit exchange, as well as the estate's BIT tokens which Defendants are actively attempting to devalue, Plaintiffs have alleged that Defendants engaged in affirmative acts which altered "the status quo of estate property as of the time when the bankruptcy

petition was filed." *City of Chicago* v. *Fulton*, 592 U.S. 154, 154 (2021).  These allegations are sufficient to plead a violation of the automatic stay.  *In re Thgh Liquidating LLC*, 2020 WL 5409002, at *5 (D. Del., 2020).

###### A.   Plaintiffs Have Adequately Alleged a Violation of the Automatic Stay With Regard to Bybit's Refusal To Process Withdrawals of Estate Assets.

As alleged in the Complaint, the Bybit Accounts are property of the estate.  Compl. ¶¶ 67-73.  Although Defendants split hairs to try to distinguish between Alameda and the affiliates that Alameda used to trade on Bybit, Plaintiffs have clearly alleged that, at all relevant times, Alameda funded and controlled each of the six Bybit accounts in question for the sole benefit of the Debtors, and to this day Alameda retains the ability to log into each of the six accounts.  *Id.*; *see supra* at Section V.A.  It is clear that "a dispute as to a debtor's property rights does not obviate the effect of the automatic stay.  To the contrary, where it is unclear whether a debtor in bankruptcy has an interest in property, parties must act with caution."  *In re Daya Meds., Inc.*, 560 B.R. 855, 858 (Bankr. S.D. Fla., 2016).  Indeed, by continually refusing to process the Debtors' withdrawal requests, Bybit is flouting one of the key purposes of the automatic stay:  "to prevent any creditor from becoming a self-determined arbiter of what constitutes property of the estate and what actions are permitted or prohibited by the stay."  *In re Johnson*, 548 B.R. 770, 787 (Bankr. S.D. Ohio, 2016); *see also Maritime Elec. Co., Inc.* v. *United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991) ("[T]he stay protects creditors by preventing particular creditors from acting unilaterally in self-interest . . . to the detriment of other creditors.").

Defendants argue that by refusing to process the withdrawal of the FTX Debtors' funds, Bybit is not violating the automatic stay because "merely retaining possession of estate property does not violate the automatic stay."  Bybit Br. at 26 (citing *City of Chicago*, 592 U.S. at 158).  According to Defendants, they have not disturbed "the status quo of estate property as of

the time when the bankruptcy petition was filed." *Id.* But this misconstrues Plaintiffs' allegations. The Complaint does not merely allege Bybit is retaining possession of estate property; the Complaint alleges that Bybit affirmatively "disabled withdrawals to prevent the Debtors from securing the assets in these accounts for the benefit of their creditors." Compl. ¶ 69. By preventing the withdrawals, Bybit has indeed disrupted the status quo: Bybit has affirmatively disabled Plaintiffs' ability to make withdrawals from these accounts and has sought to use that withdrawal freeze as leverage for its demand that the Debtors circumvent the bankruptcy process and allow Bybit's affiliated trading firm to—once again—receive preferential treatment ahead of the FTX Group's other customers and creditors. Compl. ¶¶ 68-69.

The court addressed similar issues in *In re Thgh Liquidating LLC*, in which defendants argued that by withholding payments to the debtors, they were merely maintaining the status quo. 2020 WL 5409002, at *4. The court found this argument "unavailing," however, because it determined that the decision to continue withholding post-petition payments was not a "preservation of the status quo." *Id.* On the contrary, it observed that "[e]very time an invoice was submitted for payment, the [defendant] made the determination not to pay that invoice. That is action post-petition." *Id.* (citation omitted). Likewise, by declining to process the FTX Group's withdrawal requests, as Bybit would have done in the normal course,[10] Bybit has taken and continues to take action post-petition to retain possession and control of estate property. Indeed, to the extent that Bybit is benefitting from holding hostage more than *$125 million* of FTX Group assets in its "omnibus user account," Bybit is *continuously* violating the automatic stay. *See In re Patriot National Inc.*, 592 B.R. 560, 571 (Bankr. D. Del., 2018) (finding a violation of the

---

[10] A section of the Alleged Bybit Terms and Conditions which Defendants neglect to cite states: "You may withdraw all or some of the Digital Assets under your name recorded on the Platform's ledger . . . Digital assets will be transferred from the omnibus user account held by the Platform to the specific Digital Assets address provided by you." Alleged Bybit Terms and Conditions at 7.4.

automatic stay where "Defendants have continued to use the [estate property] to their benefit despite the invocation of the automatic stay on the bankruptcy filing date.").

> **B.**     **Plaintiffs Have Adequately Alleged a Violation of the Automatic Stay With Regard to Mirana's and Bybit's Attempts To Devalue the Debtors' BIT Tokens.**

Defendants further argue that neither Mirana nor Bybit took steps to devalue the FTX Group's BIT tokens because it was BitDAO (n/k/a Mantle), a purportedly independent, "autonomous" entity controlled by "community members" that launched a "community vote" to restrict the FTX Group's ability to migrate its BIT tokens to the group's newly issued MNT tokens. Mirana Br. at 34-35; Bybit Br. at 27. Defendants' assertion flies in the face of the allegations in Plaintiffs' Complaint—a senior Bybit executive, using her Mirana e-mail address, previously acknowledged privately that Bybit controlled BitDAO, Compl. ¶¶ 76-77, and Mirana publicly acknowledges that it provides "investment, legal, and other advisory services" to Mantle. *Id.* ¶ 77 n.19. The Court should not accept as true mischaracterized "'allegations of the Defendants to the contrary" raised in a moving brief. *In re OPP Liquidating Co.*, No. 19-10729, Adv. No. 21-50431, 2022 Bankr. LEXIS 651, at *18 (Bankr. D. Del. Mar. 14, 2022). Allowing Defendants to self-servingly misconstrue Plaintiffs' claims "would be inconsistent with both (a) the rule that the Plaintiff is the master of its complaint, and (b) the court's obligation to take [the Plaintiffs'] allegations as true and construe facts in its favor." *Am. Eagle Outfitters, Inc.*, 2007 U.S. Dist. LEXIS 30074, at *9 n.4.

Moreover, and contrary to Defendants' contentions, Plaintiffs face imminent harm and loss from Bybit's and Mirana's actions. Bybit Br. at 29. The Complaint alleges that the BitDAO "community" vote, which Plaintiffs allege was controlled by Defendants, will have a significant adverse effect on the estate's BIT tokens, which potentially could result in tens of millions in losses. Compl. ¶ 77. It is well established that "[t]he reach of the automatic stay is

limited by its purposes" and section 362(a)(3) encompasses any attempt to exercise control over the estate, *including* actions that threaten to adversely impact estate property. *In re Prudential Lines Inc.*, 928 F.2d 565, 573-74 (2d Cir. 1991) (finding that a non-debtor would violate the automatic stay if allowed to take a "worthless stock deduction" that "would have the legal effect of diminishing or eliminating property of the bankrupt estate."); *see also In re Klarchek*, 508 B.R. 386, 397 (Bankr. N.D. Ill. 2014) (finding that "given the potential adverse impact on property of the estate of the action, [the commencement of Dissolution Proceedings implicating estate property] must be stayed pursuant to section 362(a)(3)."); *In re Daya Meds., Inc.*, 560 B.R. at 858 ("Even where an action does not directly affect property of the estate, it is prohibited by the automatic stay if it has an adverse impact on property of the estate."); *In re Johnson*, 548 B.R. at 790 ("[I]t is well recognized that actions against nondebtors that would have an 'adverse impact' upon the property of the estate are subject to the automatic stay under § 362(a)(3)").

## VII.   THE COMPLAINT ADEQUATELY PLEADS PROPERTY RECOVERY AND DISALLOWANCE OF CLAIMS.

Because Plaintiffs have adequately pled each of their fraudulent and preferential transfer claims, the Court should not dismiss Plaintiffs' Section 550 property recovery claim (Count V). *See Miller* v. *Mott*, No. 23-50004, 2023 WL 6467368, at *6 (Bankr. D. Del. Oct. 4, 2023) (declining to dismiss a claim pursuant to 11 U.S.C. § 550 where a claim for fraudulent transfer survives a motion to dismiss). "A party may join two claims even though one of them is contingent on the disposition of the other . . . ." Fed. R. Civ. P. 18; *see* Fed. R. Bankr. P. 7018. For the same reason, the Court should not dismiss Plaintiffs' Section 502(d) claim (Count VIII). "Because it is possible that the Plaintiffs' Section 502(d) claim may become 'cognizable' after the fraudulent transfer claims are prosecuted to conclusion, the Section 502(d) claim is legitimately joined with the Plaintiffs' other claims . . . and is not subject to dismissal for failure to state a

claim." *In re Com. Fin. Servs., Inc.*, 322 B.R. 440, 452 (Bankr. N.D. Okla. 2003); *see Mallinckrodt*, 2024 WL 206682, at *45 (declining to dismiss a Section 502(d) claim when "actual fraudulent transfer claims can proceed").

## CONCLUSION

For all of the foregoing reasons, the Court should deny the Motions in their entirety.

Dated: April 8, 2024
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      mcguire@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Steven L. Holley (admitted *pro hac vice*)
Andrew G. Dietderich (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Justin J. DeCamp (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: holleys@sullcrom.com
      dietdericha@sullcrom.com
      gluecksteinb@sullcrom.com
      decampj@sullcrom.com
      dunnec@sullcrom.com
      crokej@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*