**<u>EXHIBIT A</u>**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| FTX TRADING LTD., WEST REALM SHIRES SERVICES, INC., and ALAMEDA RESEARCH LTD., | Adv. Pro. No. 23-50759 (JTD) |
| Plaintiffs, | |
| - against - | |
| MIRANA CORP., BYBIT FINTECH LTD., TIME RESEARCH LTD., SIN WEI "SEAN" TAN, WEI LIN "GERMAINE" TAN, WEIZHENG YE, and NASHON LOO SHUN LIANG, | |
| Defendants. | |

---

### DECLARATION OF FOREIGN LAW
*of*
### RICHARD STANLEY SALTER KC

---

I, **RICHARD STANLEY SALTER**, one of His Majesty's Counsel, of 3 Verulam Buildings, Gray's Inn, London WC1R 5NT, **DECLARE** as follows:

## (A)    Introduction

1.      I have been asked by Norton Rose Fulbright ("**NRF**") on behalf of Mirana Corporation ("**Mirana**") to state my opinion for the assistance of the United States Bankruptcy Court for the District of Delaware ("**the Delaware Court**") on certain issues of the substantive law of England and Wales ("**English law**").

1

2.      For the purposes of this Declaration, I have been instructed to assume that:

    2.1.      The Debtor, FTX Trading Ltd ("**FTX**"), is a company incorporated and registered in Antigua and Barbuda (company number 17180).

    2.2.      FTX provided services to Mirana which involved (among other things):

        2.2.1.   The holding on behalf of Mirana of various amounts of fiat currency and digital assets; and

        2.2.2.   The trading on behalf of Mirana of various digital assets.

    2.3.      FTX provided those services to Mirana on the basis of the FTX Terms of Service ("**the Terms**") dated May 13, 2022.   Clause 38.11 of the Terms provided that "*The Terms and any Dispute shall be governed by, and construed in accordance with, English law*".

    2.4.      Clauses 6 and 8 to 12 of the Terms provided for FTX to operate an Account for Mirana:

        2.4.1.   Clause 8.1.1 provided that "*In order to fund your Account and begin transacting in Digital Assets using the Platform, you must first procure Digital Assets (or deposit Digital Assets that you already own into your Account) and/or load fiat currency into your Account*".

        2.4.2.   Clauses 8.2.1 to 8.2.4 provided that:

            2.4.2.1. "*8.2.1 The Platform supports deposits and withdrawals of certain Digital Assets, including certain U.S. Dollar-pegged stablecoins (each a "USD Stablecoin"). You may deposit Digital Assets that you already own into your Account by generating an address within your Account and sending your Digital Assets to such address, after which they should appear in your Account balance (USD Stablecoins will appear in your "USD Stablecoins (USD)" balance).*

            2.4.2.2. *8.2.2 You may purchase Digital Assets in exchange for certain supported fiat currencies (depending on your location) by linking a valid payment method to your Account. In such circumstances, you authorise us to debit the relevant amount of fiat currency using your selected payment method(s) to complete your purchase.*

            2.4.2.3. *8.2.3 The Platform enables you to exchange one Digital Asset for another Digital Asset, send Digital Assets to and receive Digital Assets from other Users of the Services, or third parties*

*outside of the Platform (where permitted by FTX Trading in its sole discretion).*

2.4.2.4. *8.2.4 You may sell Digital Assets in exchange for certain supported fiat currencies (depending on your location). In such circumstances, you authorise us to debit your Account and to send instructions to credit your selected payment method(s) in settlement of sell transactions.*"

2.4.3. Clause 8.2.6 provided that[1]:

*All Digital Assets are held in your Account on the following basis:*

*(A) Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.*

*(B) None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.*

*(C) You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.*

2.5.    The software of the FTX Platform enabled Mirana to make withdrawals and payments from its Account with FTX online.  All that was necessary was for Mirana to specify the coin, amount, destination and to click the onscreen "withdraw" button.

2.6.    Over time, Mirana accumulated a substantial balance on its Account with FTX. The assets accumulated in Mirana's Account with FTX were mainly digital assets. They predominantly consisted of the "stablecoins"[2] USDC[3] and USDT[4], but also

---

[1]    Emphasis added.

[2]    "Stablecoins" are "Crypto-tokens with a value that is intended to be pegged, or tied, to that of another asset, currency, commodity or financial instrument. The peg might be based on assets held by the issuer, or on a mathematical algorithm and is generally intended to remain on a stable (often 1:1) basis over time"; see the Glossary on page xiv of the *Law Commission Report* (see para 20 below).

[3]    USD Coin, a digital stablecoin pegged to the United States dollar, managed by Circle Internet Financial: see https://www.circle.com/en/usdc.

[4]    USD Tether, another digital stablecoin pegged to the United States dollar, managed by Tether Limited Inc: see https://tether.to/en/.

included other digital tokens and some USD fiat currency.

2.7.   Those assets were substantially (but not completely) withdrawn from the Account by Mirana in the period prior to the filing by FTX of a voluntary petition for relief under Chapter 11 of the US Bankruptcy Code with the Delaware Court ("the Petition") on November 11, 2022.

2.8.   By the present action, FTX seeks (inter alia) to recover the assets so withdrawn on the grounds (inter alia) that they were voidable preferences (under 11 USC § 547) or fraudulent transfers (under 11 USC § 548).

2.9.   The issue of whether the assets so withdrawn belonged at the time of withdrawal to Mirana or to FTX is relevant to the determination of the issues raised in the present action.

3.   Against that background, I have been asked to state my opinion as to the answer which an English Court, correctly applying English law, would be likely to give to the following question:

> **Having regard to the Terms, what proprietary rights (if any) were possessed (a) by Mirana and (b) by FTX in relation to any relevant assets deposited, held, received and/or acquired on the FTX Platform.**

## (B)   Expertise

### (B1)   My qualifications to express this opinion.

4.   I am a member of the Bar of England and Wales.  I was called to the Bar by the Honourable Society of the Inner Temple in 1975 and have been continuously in practice at the Bar in London since completing my pupillage in 1976.  I became a Master of the Bench of the Inner Temple in 1991[5] and was appointed one of Her Majesty's Counsel in 1995[6].   On

---

[5]   The Inner Temple is one of the four Inns of Court.  All barristers are called to the Bar by, and are members of, one of the four Inns.  "Master of the Bench" (or "Bencher") is the title give to a member of the governing body of an Inn.  I am presently the Reader of the Inner Temple and will be the Inn's Treasurer (i.e. non-executive chairman – see https://www.innertemple.org.uk/who-we-are/how-we-operate/governance/the-role-of-treasurer/) in 2025.

[6]   The rank of Queen's or King's Counsel dates back over 400 years.  King's Counsel are senior lawyers – barristers or solicitors – who are recognised experts in a particular field of law.  The rank of KC is a status, conferred by the Crown, that is recognised by the courts.  Members have the privilege of sitting within the bar of the court and, when robed, of wearing silk gowns.  The award of King's Counsel is therefore known informally as taking silk, and KCs are often colloquially called silks.  When I was appointed, recommendations were made (on application) by the Lord Chancellor.   Since 2005, appointments have been made (again on application) on the recommendation of an independent body, now called "King's Counsel Appointments", under a process agreed between the Bar Council and the Law Society and approved by the Lord Chancellor and Secretary of State for Constitutional Affairs in 2004.

the death of her Majesty Queen Elizabeth II and the accession of King Charles III, I (like all other Queen's Counsel) automatically became a King's Counsel[7].

5.     I specialise in commercial law, and regularly appear as counsel before the Commercial Court in London, and before the other judges of the King's Bench Division and the Chancery Division of the High Court.  I have also acted as counsel on many occasions before the Court of Appeal and have appeared in leading cases before the Judicial Committee of the House of Lords, its successor The Supreme Court of the United Kingdom (which is the final court of appeal in the UK for civil cases)[8], and the Judicial Committee of the Privy Council[9].

6.     In addition to my work in litigation, I have a substantial advisory practice.  Over the course of my career, I have provided advice to many of the major banks and other entities involved in the London and international financial markets.

7.     I have been a Recorder[10] of the Crown Court since 2000, and since 2010 have been authorised under the Senior Courts Act 1981 s 9[11] to sit (and do sit) as a deputy judge in the King's Bench Division and (since 2016) in the Commercial Court[12] of the High Court.

---

[7]     Demise of the Crown Act 1901 s 1, which provides that "*The holding of any office under the Crown, whether within or without His Majesty's dominions, shall not be affected, nor shall any fresh appointment thereto be rendered necessary, by the demise of the Crown*".

[8]     The Senior Courts of England and Wales consist of the Court of Appeal, the High Court of Justice and the Crown Court: see the Senior Courts Act 1981 s 1 (as amended).  The High Court of Justice is a superior court of record: ibid s 19(1).  It is the court of first instance for the trial of more substantial or complex civil disputes.  Appeals from the High Court lie to the Court of Appeal, and from the Court of Appeal to the Supreme Court.  Less substantial civil cases are dealt with by the County Courts.  The Crown Court deals with the more serious criminal cases.  Less serious criminal cases are dealt with by the Magistrates' Courts.  Under the doctrine of judicial precedent, "*On issues of law, (i) circuit judges are bound by decisions of High Court judges, the Court of Appeal and the Supreme Court, (ii) High Court judges are bound by decisions of the Court of Appeal and the Supreme Court, and (iii) the Court of Appeal is bound by decisions of the Supreme Court .. [and] .. is bound by its own previous decisions, subject to limited exceptions*": *Willers v Joyce (No 2)* [2016] UKSC 44, [2018] AC 843 at [5] and [8]. Under the *Practice Statement (Judicial Precedent)* [1996] 1 WLR 1234 the Supreme Court will regard its own earlier decisions as "*normally binding*" but will depart from them "*when it appears right to do so*".

[9]     The Judicial Committee of the Privy Council is the court of final appeal for the UK overseas territories and Crown dependencies. It also serves those Commonwealth countries that have retained the appeal to His Majesty in Council or, in the case of republics, to the Judicial Committee: see https://www.jcpc.uk/.

[10]    A Recorder is a fee-paid part-time judge, appointed by the Crown on the recommendation of the Lord Chancellor, under The Courts Act 1971 s 21.  Recorders are required to sit as judges for between 15 and 30 days in each year.

[11]    In civil matters, Recorders usually sit as judges only in the County Court.  Section 9(1) of the Senior Courts Act 1981 provides (inter alia) for the Lord or Lady Chief Justice, or his or her nominee (usually the Heads of Division) to authorise a Recorder also to sit as a judge in the High Court.

[12]    The Commercial Court is a sub-division of the King's Bench Division of the High Court of Justice and forms part of the Business and Property Courts of England and Wales (see https://www.judiciary.uk/courts-and-tribunals/business-and-property-courts/).  The work of the Commercial Court encompasses all aspects of commercial disputes, in the fields of banking and finance, shipping, insurance and reinsurance, and commodities. The Court is also the principal supervisory court for arbitrations with a seat in England and Wales.

8.    I have written and lectured academically on many occasions on various commercial law topics. I hold the honorary title of Visiting Professor in the Law Faculty of the University of Oxford, where I assist *pro bono* with the teaching of post-graduate courses entitled "Corporate Finance Law" and "Legal Concepts in Financial Law". In the past two academic years, I have also assisted (by invitation, and on the same unpaid basis) with the teaching of the post-graduate course on "English, Comparative and Transnational Secured Transactions Law" at the University of Cambridge. I am currently working with a colleague at Oxford on producing the second (and expanded) edition of the OUP textbook *Financial Law*, originally written by Professor Joanna Benjamin.

9.    I am familiar with the particular legal issues relating to digital assets. I am an active participant in the Digital Assets Project which was set up in September 2018 under the auspices of the Commercial Law Centre at Harris Manchester College in the University of Oxford. This exists to coordinate and bring people together and to support individuals and their research projects in this area of law, and usually meets twice a year to consider the latest relevant scholarship. I have advised professionally in a number of cases concerning digital assets. I have also recently acted as sole arbitrator appointed by the parties in a strongly contested arbitration in London between an exchange and a participant concerning the terms of a co-investment in a re-packaging structure for ETH.

10.   A more detailed *curriculum vitae* for me may be found on the website of my chambers at https://www.3vb.com/our-people/qc/richard-salter-qc and on the University of Oxford Faculty of Law website at https://www.law.ox.ac.uk/people/richard-salter-qc. The Faculty website also includes a list of my academic publications.

11.   I understand that my duty in providing this Report is to help the Delaware Court, and that this duty overrides any obligation to the party by whom I have been engaged or the person who has paid or is liable to pay me. I confirm that I have complied and will continue to comply with this duty. Apart from my instructions to prepare this Declaration, I have no connection with Mirana or with any of the other parties involved in this case (although for completeness I should mention that I have from time to time acted in other unrelated matters as counsel for clients other than Mirana on the instructions of the London office of NRF). I am being paid only my usual professional fees and expenses for my work in connection with this case and have no financial interest in the outcome.

## (C)    The nature of Digital Assets under English Law

12.   In English law, the accepted view (until recently) was that "*Divisions and sub-divisions in the [English] law of property take a series of binary forms. First of all, property is divided into realty and personalty .. As for personalty, a distinction is classically drawn between things in action and things in possession*"[13]. Furthermore, the traditional view (as Fry LJ

---

[13]    M Bridge, L Gullifer, K Low and G McMeel, *The Law of Personal Property* (3rd edn, Sweet & Maxwell, 2021) paras [4.001]- [4002]. "In the protection of rights of personal property, the common law historically drew a distinction between tangible and intangible property. Tangible property, usually

famously said in *Colonial Bank v Whinney*[14]) was that "*All personal things are either in possession or action. The law knows no tertium quid between the two*."

13. Digital assets unfortunately do not fit neatly into any of these categories. They are not real property and are neither a thing in action nor a thing in possession. As David Quest QC explained in his 2015 article in the *Journal of International Banking and Financial Law*:

> **.. The problem then is that [a digital asset such as] a bitcoin is intangible in a more fundamental way than a bank deposit .. a bitcoin is fundamentally no more than the knowledge of the relevant private key, since it is that knowledge, and only that knowledge, that gives control of the bitcoin. Although a record of the private key, whether in the form of a computer file or in a more tangible form, is no doubt capable of being property, the bitcoin itself has no tangible existence – it is ultimately just a mathematical construct. And, unlike a bank balance, bank note or negotiable instrument, a bitcoin confers no legal right against any third party. Bitcoins have value only to the extent that other participants in the Bitcoin system are willing to accept them as payment .. English law concepts of property cannot therefore easily be applied to bitcoins ..**[15]

14. In response, however, to the increasing use of digital currencies and other digital tokens, a UK Jurisdiction Task Force was set up under the auspices of Sir Geoffrey Vos (then Chancellor of the High Court and now Master of the Rolls, the most senior civil judge) with the intention of moving English law forward to accommodate what had, by then, become the ever-growing use of digital assets and records. This Task Force published in November 2019 a "*Legal Statement on Cryptoassets and Smart Contracts*" ("*the UKJTF Statement*"). Its conclusion[16] was that "*cryptoassets have all the indicia of property*", that the characteristic (and sometimes novel) features of cryptoassets[17] do not disqualify them from being property, and that "*cryptoassets are therefore to be treated in principle as property*".

15. The *UKJTF Statement* did not have any formal status as a legal precedent. Its conclusion was nevertheless followed and applied by Bryan J at first instance in December 2019 in the case of *AA v Persons Unknown*[18] on the basis that he regarded the reasoning of the *UKJTF Statement* to be "*compelling and for the reasons identified therein should be adopted by this court*".

---

referred to as chattels but sometimes as choses in possession, could be the subject of physical possession and thereby physical control, whereas intangible property, consisting of rights to benefits obtainable only by action (and thus known as choses in action), could not": *Your Response Ltd v Datateam Business Media Ltd* [2014] EWCA Civ 281, [2015] QB 41 at [13], per Moore-Bick LJ

[14]  (1885) 30 Ch D 261.

[15]  David Quest, 'Taking security over bitcoins and other virtual currency' (2015) JIBFL 401. David Quest was later one of the authors of the UKJT's Legal Statement: see para 14 below.

[16]  In para [85].

[17]  The characteristic features of crypto-assets involve "(a) intangibility, (b) cryptographic authentication, (c) use of a distributed transaction ledger, (d) decentralisation, and (e) rule by consensus": para [31]

[18]  [2019] EWHC 3556 (Comm), [2020] 4 WLR 35

16.   The approach of Bryan J in recognising digital assets as a new form of property in English law has subsequently been followed by an unbroken line of first instance decisions (albeit mostly on interim applications) to similar effect[19].

17.   In July 2022, the Law Commission (which is the statutory independent body created by the Law Commissions Act 1965 to keep the law of England and Wales under review and to recommend reform where it is needed[20]) published its "*Digital Assets Consultation Paper*"[21] ("***the Law Commission Consultation***") which contained a detailed review both of the nature of digital assets and of the general features of personal property law in England and Wales.  This "endorsed an understanding" of property in English law as "not a thing at all but a socially approved power-relationship in respect of socially valued assets, things or resources"[22].

18.   On this basis the *Law Commission Consultation* proposed that English law should recognise a third category of personal property (in addition to things in action and things in possession), and that a thing (such as a digital asset) should be recognised as falling within this third category if (1) it is composed of data represented in an electronic medium, including in the form of computer code, electronic, digital or analogue signals; (2) it exists independently of persons and exists independently of the legal system; and (3) it is "rivalrous".  By way of explanation of this last concept, "*Rivalrousness, at its core, 'is the idea that if I have a thing, you don't. If I give it to you, you have it, and I don't'*"[23].

19.   That concept was considered and adopted as part of its reasoning by the Court of Appeal in February 2023 in the case of *Tulip Trading Ltd v Bitcoin Association for BSV ("**Tulip Trading**")*[24].  After a detailed consideration of the mechanics of the operation of Bitcoin, Birss LJ (with whom Popplewell and Lewison LJJ agreed) said this[25]:

> **.. The signing of the hashed transaction record with users' private keys in the first place, and the incorporation of these records into a hashed chain of blocks produced by the proof of work, solves the double spending problem. This characteristic of bitcoin does not emerge as a**

---

19      See e.g. *Toma v Murrey* [2020] EWHC 2295 (Ch); *Litecoin Foundation Ltd v Inshallah Ltd* [2021] EWHC 1998 (Ch*); Fetch.AI Ltd & Anor v Persons Unknown Category A & Ors* [2021] EWHC 2254 (Comm)  *DPP v Briedis* [2021] EWHC 3155 (Admin); *XY v Persons Unknown & Ors* [2021] EWHC 3352 (Comm) *Danisz v Persons Unknown* [2022] EWHC 280 (QB); *Osbourne v Persons Unknown* [2022] EWHC 1021 (Comm*); D'Aloia v Persons Unknown & Ors* [2022] EWHC 1723 (Ch); *Nicholls v Little* [2022] EWHC 2344 (QB); *Jones v Persons Unknown* [2022] EWHC 2543 (Comm); *LMN v Bitflyer Holdings Inc* [2022] EWHC 2954 (Comm)  [2023] 2 All ER (Comm) 411; and *Boonyaem v Persons Unknown* [2023] EWHC 3180 (Comm).

20      See https://lawcom.gov.uk/.

21      Law Comm No 256

22      At [2.10].  This is very close to the practical view recently advanced by Professor Sir Roy Goode KC that, subject to statute, the common law should move towards recognising as property anything that is of realisable commercial value: see R Goode, 'What is Property?' (2023) 139 LQR 1.

23      At [2.62], quoting J Fairfield, 'Tokenized: The Law of Non-Fungible Tokens and Unique Digital Property' (2022) 97 Indiana Law Journal 1261 at 1266.  The *Law Commission Consultation* goes on to discuss the meaning of "rivalrousness" in detail from [2.62] onwards.

24      [2023] EWCA Civ 83 | [2023] 4 WLR 16.

25      At [24] (emphasis added).

> **matter of law or convention, it is a characteristic which arises as a matter of fact from the way the software works. As a result, it is meaningful to describe bitcoin not merely as something which is transferable but as "rivalrous" (see [the *Law Commission Consultation*] [Ch 5.48]).**
>
> **For a transferable thing to be rivalrous, the holding of it by one person necessarily prevents another from holding that very thing at the same time. Because the holder cannot double spend their bitcoin, such that it is rivalrous, the cryptoasset can be said to be capable of assumption by a third party (see the definition of property in *National Provincial Bank v Ainsworth* [1965] AC 1175). Thus, as Bryan J held in *AA v Persons Unknown* [2019] EWHC (Comm) 3556; [2020] 4 WLR 35, paras 55–61 citing *Ainsworth*, <u>a cryptoasset such as bitcoin is property.</u>**

20. Finally (at least so far) in this history of the development of the law, in the light of the responses to its Consultation Paper, in June 2023 the Law Commission published its *Digital Assets: Final Report* ("***the Law Commission Report***"). This noted the Court of Appeal's decision in *Tulip Trading* and the first-instance decisions which had preceded it, and concluded that "*some digital assets are neither things in possession nor things in action, but that nonetheless the law of England and Wales treats them as capable of being things to which personal property rights can relate*" [26].

21. Although there is still controversy in some academic circles[27], and although the ruling on the point in *Tulip Trading* may not strictly be binding as a matter of precedent (since it was a decision on an application to set aside service, and so only ruled on the question of whether there was a serious issue to be tried), the ruling that "*a cryptoasset such as bitcoin is property*" is in my opinion almost certain to be followed in subsequent cases, at least at the level of the Court of Appeal and below.

22. In the light of the *UKJTF Statement*[28], the firmly-expressed views of the Law Commission[29], the adoption of similar views in other common-law jurisdictions[30], and the

---

[26] Law Com No 412 at [2.45]

[27] See e.g. Robert Stevens, 'Crypto is not Property' (2023) 139 LQR 695. According to Professor Stevens, "[T]he case for the legislature recognising cryptoassets as "property" generally for legal purposes is extremely weak, and that for the courts taking such a step non-existent. Lawyers should not be bedazzled by new technology, nor by these innovative ways of holding wealth. Almost all cryptoassets are unproductive and many are positively harmful. For most of their forms, our legal system should not be seeking to facilitate them but, alongside other jurisdictions, attempting to eliminate their use where possible".

[28] See para 14 above.

[29] See paras 17, 18 and 20 above.

[30] For example, in Singapore (and despite any uncertainties resulting from the decisions in *B2C2 Ltd v Quoine Pte Ltd* [2019] SGHC(I) 3 and *Quoine Pte Ltd v. B2C2 Ltd*. [2020] SGCA(I) 02), the case of *CLM v CLN* [2022] 5 SLR 273 decided that Ethereum could be "property" for the purposes of an interim injunction; the case of *Janesh s/o Rajkumar v Unknown Person* [2023] 3 SLR 1191 held that a non-fungible token could be "property" for the purposes of an interim injunction.; and the case of *Bybit Fintech Ltd v Ho Kai Xin and ors* [2023] SGHC 199 decided that Tether could be "property" capable of being held on trust. In New Zealand, *Beck v Wilkerson* [2019] NZFC 9883 and *Ruscoe & Moore v Cryptopia Limited (in liquidation)* [2020] NZHC 728 both assume that cryptocurrencies can be "property". In Canada, decisions such as *Shair.com Global Digital Services Ltd v Arnold* [2018] BCSC

compelling practical reasons which led to the setting up of the UKJTF[31], it seems to me to be extremely improbable that the Supreme Court would take a different view, were a case involving this point to get there.

23.   It follows that, in my opinion, even endogenous digital currencies (such as Bitcoin and Ether) are, in English law, now to be treated as a species of intangible "property".   The position in relation to "stablecoins" (like USDC and USDT) is my view *a fortiori*, since the managers' promises to redeem or to exchange them for fiat currency could well mean that they would in any event be regarded as "property" in the category of things in action[32].

## (D)   The Legal Effect of the Terms

### (D1)   *The Interpretation of Contracts under English Law*

*24.*   The opening words of the Terms state expressly that they "constitute an agreement" between FTX and its customer.   The effect of the Terms is therefore primarily a matter of interpretation of that agreement. An English court would approach that issue by applying its usual principles for the interpretation of commercial contracts.

25.   As to those principles, in the English law of contract[33]:

> **.. Interpretation is the ascertainment of the objective meaning of the language in which the parties have chosen to express their agreement, in its documentary, factual and commercial context. That meaning is what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be**

---

1512; *Cicada 137 LLC v. Medjedovic* [2022] ONSC 369, and *Li v Barber* [2022] ONSC 1176 have shown a willingness to treat digital assets as property.  In Australia, in *Chen v Blockchain Global Ltd; Abel v Blockchain Global Ltd* [2022] VSC 92, the Supreme Court of Victoria seems to have had little difficulty accepting that Bitcoin amounted to "property" capable of being subject to a preservation order. The Hong Kong Court of First Instance has also recently confirmed that a crypto-token is capable of being an object of personal property rights under Hong Kong law and is capable of being held on trust: *Re Gatecoin Limited* [2023] HKCFI 914.

[31]   As Sir Geoffrey Vos C said in his Foreword to the UKJTF Statement, "In legal terms, cryptoassets and smart contracts undoubtedly represent the future. I hope that the Legal Statement will go a long way towards providing much needed market confidence, legal certainty and predictability in areas that are of great importance to the technological and legal communities and to the global financial services industry".

[32]   See e.g. *Boonyaem v Persons Unknown* (fn 19 above) at [24].

[33]   Lewison, *The Interpretation of Contracts*, 8th edn, Sweet & Maxwell 2023) ("***Lewison***") at [1.01]. Lewison is the leading practitioners' textbook on the English law of contractual interpretation.  For a more detailed overview of the applicable principles of contractual interpretation, see (in particular) chapters 1 to 3 of *Lewison*, and  Beale et al, *Chitty on Contracts* (35th edn, Sweet & Maxwell, 2023) (which is the leading practitioners' textbook on the English law of contract) ("***Chitty***") Ch 16 at [16-047] and following. The leading recent Supreme Court cases on interpretation, from which these principles are derived, are *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50, [2011] 1 WLR 2900; *Arnold v Britton* [2015] UKSC 36, [2015] AC 1618, and *Wood v Capita Insurance Services* [2017] UKSC 24, [2017] AC 1173.  The two footnotes which follow are in square brackets as they are my own clarificatory interpolations to the quotation from *Lewison* that is set out in the body of the Declaration.

using the language in the contract to mean. Both the text and the context are tools in the process of interpretation.

The text must be assessed in the light of (i) the natural and ordinary meaning of the words, (ii) any other relevant provisions of the contract, and (iii) the overall purpose of the clause and the contract. The factual context includes facts and circumstances known or assumed by the parties at the time that the document was executed. It also includes background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract[34].

The process is a unitary and iterative one by which each suggested interpretation is checked against the provisions of the contract and its commercial consequences are investigated. The weight to be given to each will depend on a number of factors, including the formality of the agreement and the quality of the drafting.

If the language of the contract is unambiguous the court must apply it. But if there are two possible interpretations, the court is entitled to prefer the interpretation which is consistent with business common sense as at the date of the contract and to reject the other. Nevertheless, the commercial consequences of one interpretation as against another do not detract from the importance of the words.

In exceptional circumstances the court may conclude that the parties have used the wrong words. If it is clear what the error is, and the nature of the correction required, the court may correct it.

In carrying out its task, the court must disregard the parties' subjective intentions, and (except for limited purposes) the negotiations that preceded the making of the contract ..[35]

*(D2)   My role*

26.    I understand that it could help the Delaware Court for me to express in this Declaration my view as to the interpretation which an English court, applying these principles,

---

[34]    [When interpreting a contractual provision, one can only take into account facts or circumstances which existed at the time the contract was made, and which were known or reasonably available to both parties. It follows that that the subsequent conduct of the parties cannot be looked at in order to construe a written contract unless that conduct amounted to a variation of the contract, or gave rise to an estoppel: see eg *James Miller and Partners Ltd v Whitworth Street Estates (Manchester) Ltd* [1970] AC 583; and *Schuler (L) AG v Wickman Machine Tool Sales Ltd* [1974] AC 235. See also *Chitty* at [16-061]; and *Lewison* Ch 3 section 19.]

[35]    ["The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent. They are admissible only in an action for rectification. The law makes this distinction for reasons of practical policy and, in this respect only, legal interpretation differs from the way we would interpret utterances in ordinary life": *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896 at 913B, per Lord Hoffmann. See also *Chitty* at [16-060]; and *Lewison* Ch 3 section 9]

would be likely to put on the Terms and as to their legal effect.   I therefore do so in the following sections of this Declaration.

*(D3)   Ownership*

27.    The provisions of the Terms quoted in paragraph 2.4 above refer to Mirana's digital assets as being held "in" the Account.  In practice, however, it seems unlikely that that was literally true, and much more likely that the Account maintained by FTX for Mirana was simply a record kept by FTX (pursuant to its contractual obligations) of Mirana's transactions and the resultant holdings.  That record must be distinguished from the digital assets themselves, which exist independently as data objects on blockchains, are linked to network addresses in accordance with the blockchain protocol, and are controllable only by the use of the associated private keys.

28.    In the case of digital assets whose architecture involves a blockchain (including USDC and USDT), it is generally considered that the legal owner is the person who controls the relevant network address through possession of the relevant private key[36].  However, as both the *UKJTF Statement* and the *Law Commission Consultation* have noted, "*the state of the distributed ledger or structured record should not necessarily be regarded as a definitive record of legal title to a crypto token*"[37].   As Prof David Fox has observed[38]:

> **.. The general law of property defines a standard of legal validity that is external to the software protocol governing the system. The blockchain may provide a definitive record of the links between discrete transactions on the system, but it cannot be a record of their legal effect ..**

29.    It was therefore in principle open to FTX and Mirana to agree which of them would, as between themselves, own the assets of which the Account was a record, irrespective of the position recorded on the blockchain. This they have purported to do by the provisions in clause 8.2.6 of the Terms.

30.    There are four possible legal characterisations of the relationship between an intermediary such as FTX and its clients such as Mirana.  They are: (1) outright title transfer, i.e. where legal title is vested absolutely in the intermediary; (2) trust, i.e. where, rather than holding the asset absolutely, the intermediary holds the asset on trust for the client[39]; (3) quasi-bailment (it is not possible in English law to create a bailment

---

[36]    "The starting point, in our view, is that a person who has acquired knowledge and control of a private key by some lawful means would generally be treated as the owner of the associated cryptoasset, in much the same way that a person lawfully in possession of a tangible asset is presumed to be the owner": *UKJTF Statement* para 43.

[37]    *Law Commission Consultation*, para [13.8].  See also the *UKJTF Statement*, para [46].

[38]    D Fox, 'Cryptocurrencies in the Common Law of Property' in D Fox and S Green, *Cryptocurrencies in Public and Private Law* (OUP, 2019) para 6.49.  Prof Fox introduced an earlier draft of this chapter at one of the first meetings of the Digital Assets Project.

[39]    English law recognises a distinction between the "legal" title of the trustee to the trust assets, and the "equitable" proprietary interest of the beneficiary in those assets.  "Once a trust is established, as from the date of its establishment the beneficiary has, in equity, a proprietary interest in the trust property,

of an intangible asset, but it has been suggested academically that the principles relating to bailment might be applied to digital assets by analogy with the holding of physical, tangible assets); and (4) mere contractual obligations (where there is no outright title transfer, trust, or quasi-bailment, the legal relationship between the client and intermediary can only sound in contract)[40].

31.    In any particular case, "the legal characterisation of the relationship, as well as the precise obligations undertaken by the intermediary, will depend on the client-intermediary agreement"[41].

32.    In the present case, Clause 8.2.6 says in terms that "*Title to your Digital Assets shall at all times remain with you and shall not transferred to [FTX] .. None of the Digital Assets in your Account are the property of ..[FTX]*".    Of the four possibilities, that seems to me plainly to exclude (1) – outright transfer to the intermediary[42].    It also seems to me to exclude (4) – mere contractual obligations - since FTX does not acquire outright ownership of the assets[43].    The relationship created between FTX and Mirana by clause 8.2.6 is entirely different from that typically created (for example) between a bank and its customer, where  money deposited by the customer becomes the bank's own property which the bank may use to make profits for itself, and the bank owes only a contractual debt to the customer[44].    Here Mirana is expressly to remain the owner of the assets.

33.    Clause 8.2.6(C), which says that "*You control the Digital Assets held in your Account* " and may "*withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party*", might suggest that Mirana was intended to remain the legal owner of the assets in the Account, and the Account to operate as a kind of "wallet"[45].    That would be consistent with the ability of Mirana (as described in paragraph 2.5 above) to make withdrawals and payments online, without intervention from FTX.

---

which proprietary interest will be enforceable in equity against any subsequent holder of the property (whether the original property or substituted property into which it can be traced) other than a purchaser for value of the legal interest without notice": *Westdeutsche Landesbank Girozentrale v Islington London Borough Council* [1996] AC 669 at 705F, per Lord Browne-Wilkinson.

[40]    L Gullifer, H Chong and Hin Liu, 'Client-Intermediary Relations in the Crypto-Asset World' University of Cambridge Legal Studies Research Paper 18/2021, March 2021, ("**Gullifer, Chong and Liu**") pages 2-7.  Cf the *Law Commission Consultation* paras [16.42] to [16-72]

[41]    *Gullifer, Chong and Liu*, page 2.

[42]    "[O]utright title transfer [is] an unlikely possibility, as the asset is expressed to be held on behalf of the client" *Gullifer, Chong and Liu* page 17.

[43]    "Mere contractual obligation' is also a very unlikely possibility": *Gullifer, Chong and Liu* page 17.

[44]    See e.g. *Foley v Hill* (1847) 2 HLC 28 and *Libyan Arab Foreign Bank v Bankers Trust Co* [1989] QB 728 at 748D to 751H, per Staughton J.

[45]    "An owner may have control using hardware or software (even online software) provided by another party. Software of this nature is sometimes called a "wallet". However, as long as the owner controls the digital asset, this arrangement does not amount to custody. Thus, the owner remains the (legal) owner of the digital asset, and any duties owed to it by the other party are contractual or, possibly, tortious": Louise Gullifer, *Goode and Gullifer on Legal Problems of Credit and Security* (7th edn, Sweet & Maxwell, 2023) ("**Goode on Legal Problems**") para [6-32].

34.    In those circumstances, if Mirana could identify a particular digital asset deposited or received within the assets now held by FTX (for example if it remains at the network address where it was first deposited) or in the hands of another party, then Mirana itself would have title[46] to that digital asset and would be able to recover the asset, free of any claims of other customers or creditors of FTX.

35.    As I understand the position, however, the way in which FTX Trading held its digital assets means that Mirana may be unable specifically to identify the originally deposited or received digital assets.  According to the Law Commission:

> **.. Under current market practice, a holding intermediary will sometimes use a single network address to hold — on a collective basis — the crypto-token entitlements of a number of users at the same time. Where the entitlements comprise of, or relate to, crypto-tokens which are fungible, they are typically retained or recorded as pooled, consolidated balances. In these circumstances, there are not normally any specific, segregated allocations in those accounts or network addresses that can be linked to the claims of individual users ..[47]**

It seems likely that that was FTX Trading's practice too, because one of its published "key investor protection principles" was "maintaining adequate liquid resources to ensure the platform can return the customer's assets on request", which suggests that it met withdrawal requests from a general pool of assets. In that case, identifying and recovering the original digital asset may be difficult or impossible.

36.    In the circumstances, it seems to me likely that an English court would hold that the correct interpretation is that clause 8.2.6 was intended to create a trust under which, although FTX would be the legal owner of the digital assets recorded in Mirana's Account, those digital assets would be owned beneficially by Mirana[48].

37.    In the context of conventional (i.e. non-digital) assets, this is a well-established custodial framework[49].  Provided that digital assets are (as I have suggested) to be regarded as property, this framework is equally capable of application to them[50].

---

[46]    The precise nature of the title may depend on the resolution of the debate (see the *UKJTF Statement* paras 45 to 48, the *Law Commission Consultation* paras 12.10, 13.18 and 13.19, *Tulip Trading* at [76], per Birss LJ, and the *Law Commission Report* paras 6.21 to 6.38) about whether the on-chain transfer of a digital asset creates a new, original title ("the extinction/creation analysis") or whether the existing title passes to the transferee ("the persistent thing analysis"). As to that, the Law Commission have said that "We conclude that there is no "correct" analysis; both could be said to be accurate in their own ways. However, consultees offered a number of arguments as to why the most practically accurate analysis is the persistent thing analysis": *Law Commission Report* para 6.32

[47]    *Law Commission Report* para 7.3.  See also the the *Law Commission Consultation* at para [16.66].

[48]    "[T]he most likely characterisation of the client-intermediary relationship is that of trustee and beneficiary": *Gullifer, Chong and Liu*, page 17.

[49]    See eg M Yates and G Montague, *The Law of Global Custody* (4th edn, Bloomsbury 2013) para 3.24.

[50]    "On the basis that digital assets can be "property" under English law, there seems to be no problem with them being held on trust in this way providing that the requirements of a valid trust are fulfilled. In this

38. In English law, for an arrangement to be effective as a trust, it needs to satisfy the "three certainties": certainty of intention, certainty of objects, and certainty of subject matter[51]. As the *Law Commission Consultation* notes[52]

> **In the context with which we are concerned, this requires the following:**
>
> **(1) A clear intention by the relevant party or parties for the custodian to hold its title to specified crypto-token entitlements on trust for one or more beneficiaries (and resulting in the grant of equitable property claims in such entitlements to those beneficiaries);**
>
> **(2) Sufficient identification of the beneficiaries that are the objects of the trust; and**
>
> **(3) Sufficient identification of the crypto-token entitlements constituting the property interests that will be the subject matter of the trust.**

39. In my view, an English court would be likely to hold that the first two of these three "certainties" are plainly satisfied in the present case. As for the first (certainty of intention), clause 8.2.6 of the Terms demonstrates an express intention that Mirana (and not FTX) should own the assets in the Account. The only way of giving effect to that intention if (as I have assumed[53]) the digital assets were pooled and possession and control of the relevant private keys in practice remained with FTX, would be for FTX to hold its legal title to the relevant digital assets on trust for Mirana[54].

40. So, for example, in *Ruscoe v Cryptopia Ltd (in liquidation)*[55], the web-based instruction pages and live customer interfaces of a cryptocurrency trading exchange known as Cryptopia made it clear that account holders would be depositing, trading and owning their own cryptocurrency in return for certain fees charged by Cryptopia. The High Court of New Zealand, in holding that Cryptopia held that assets of its customers on express trust, laid stress on the fact that the possessive or proprietary language used (e g "your" cryptoassets) was consistent with the existence of an express trust.

41. As for the second of these "certainties" (certainty of objects), Mirana is clearly identified as the person entitled to the beneficial interest in the digital assets held in its Account.

---

situation, the client will have a proprietary interest and the digital assets will not form part of the custodian's insolvency estate": *Goode on Legal Problems* para [6-32]

[51]   See J McGhee and S Elliott, *Snell's Equity* (34th edn, Sweet & Maxwell 2019) para [22-012].

[52]   At [16-56] citing *Gullifer, Chong and Liu* at page 4.

[53]   See paras 33 and 36 above.

[54]   As Lord Lindley famously observed in *Hardoon v Belilios* [1901] AC 118 (PC) at 123, "All that is necessary to establish the relation of trustee and cestui que trust is to prove that the legal title was in the plaintiff and the equitable title is in the defendant .. Being provided, no matter how, the relation of trustee and cestui que trust was thereby established". See e.g. *Don King Productions v Warren* [2000] Ch 291 at 317, per Lightman J, affirmed by the CA, which explains the limited application (to situations unlike the present) of the observations of Lord Browne-Wilkinson in *Westdeutsche v Islington LBC* [1996] AC 669 at 707 that the separation of the legal from the equitable interest does not necessarily import a trust.

[55]   [2020] NZHC 728.

42.    Clauses 7.10, 8.1.3, 8.3 .6, 10.2, 10.3.1, and 16.2 of the Terms give FTX the right, in various circumstances, to deduct or to remove Digital Assets from Mirana's Account or to freeze Mirana's Account.  In my view, however, an English court would be unlikely to hold that these rights are inconsistent with the trust analysis. They simply operate as qualifications to Mirana's right as beneficial owner of the digital assets in the Account[56].

43.    Clause 2.1.3 also provides that FTX has no fiduciary relationship or obligation to Mirana in connection with its trades or other decisions of activities[57].  The context, however, makes it clear that this exclusion is directed at avoiding fiduciary (or other) duties in relation to trading activities (e.g. a duty to advise or to act in the customer's best interests or to avoid any conflict of interests).  Again, in my view, an English court would be unlikely to hold that this provision is in any way inconsistent with a trust analysis in relation to the digital assets in the Account.  Any other conclusion would be inconsistent with the ownership position clearly stated in clause 8.2.6.

44.    That brings me to the third of the required certainties, certainty of subject matter.  As I have already noted, where individual digital assets have been held on a segregated basis for Mirana by FTX, no problem should arise.  Those digital assets can be identified with certainty as belonging to Mirana.  However, if (as seems likely) FTX held digital assets for Mirana and other clients at network addresses or higher-tier Accounts on a collective, commingled basis, without any identifiable allocation or segregation in relation to the claims of individual users, this might be argued to bring into play the so-called "allocation principle" or what has been described as "the law's insistence that proprietary rights cannot be acquired in fungibles forming an unidentified part of a bulk until they have been separated by some suitable act of appropriation"[58].

45.    The cases in which this principle has been applied have primarily concerned tangibles: and commentators have observed that it makes little sense in the context of the sort of

---

[56]    Cf *Re LBIE, Lomas v RAB Market Cycles (Master) Fund Limited and Hong Leong Bank Berhad* [2009] EWHC 2545 (Ch), and *Re LBIE, Pearson v Lehman Brothers Finance SA* [2010] EWHC 2914 (Ch), where Briggs J held that even a full right of use would not *per se* negate the existence of a trust.  See also Fausto Giacomet, 'The treatment of client assets in prime brokerage' (2013) 8 CMLJ 205 at 209, and Richard Salter, 'Does a 'right of us' preclude the existence of a trust' (2020) 11 JIBFL 738. See also *Citibank NA v MBIA Assurance SA* [2007] EWCA Civ 11, [2007] 1 All ER (Comm) 475; and *Children's Investment Fund Foundation (UK) v Attorney General* [2020] UKSC 33, [2022] AC 155 at [79] and [82], per Lady Arden JSC.

[57]    Clause 2.1 3 states (in full) "FTX Trading is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services".

[58]    R Goode, 'Ownership and Obligation in Commercial Transactions' (1987) 103 LQR 433 at 436. See e.g. *Re London Wine Co (Shippers)* [1986] PCC 121; and *Re Goldcorp Exchange Ltd* [1995]1 AC 74.

intangibles encountered in the financial world, such as debts, shares or other securities[59]. As Prof Gullifer notes[60]:

> **.. It is indisputable that, when issued, shares of a single issue are identical and, now that registered shares are in practice unnumbered, there is no way to distinguish one share from another at the time of issue, or the time of transfer. If identification in the sense of separation was required in relation to transfers of shares, no transfer of shares at law would ever be valid. The "problem" of identification is thus the same in relation to the interests of legal owners of shares as it is in relation to the equitable interest of a beneficiary under a trust of shares, although it is the latter issue which has attracted the most attention by the courts and by commentators. If one cannot identify the subject matter of a declaration of trust of 40 shares out of a shareholding of 100, one cannot identify 40 shares which are transferred at law by registration of 40 shares in the name of the transferee.**

> **If the problem is the same, the solution also has to be the same. One reason why there appears to be concern over identification of shares held on trust, but not in relation to identification of a shareholding at law, is that it is said that the shareholding at law is identified by registration. However, registration does not separate 50 shares from all the other shares of that issue. It merely identifies the legal owner's interest as a shareholder of 50 shares, i.e. its shareholding.**

46.    The solution which the courts have adopted to deal with such situations is that of "beneficial co-ownership" by way of "equitable tenancy in common" of the assets in the common pool. The leading case in the relevant line of authorities is the decision of the Court of Appeal in *Hunter v Moss*[61]. In that case A was the registered holder of 950 shares in a company which had 1000 shares. He said he would hold 5% of the company's

---

[59]    See e.g. R. Goode, 'Are Intangible Assets Fungible?' [2003] LMCLQ 379. Interestingly, a 2018 paper 'Making Bitcoin Legal' by R Anderson, M Ahmed, and I Shumailov of the University of Cambridge Computing Laboratory (https://www.cl.cam.ac.uk/~rja14/Papers/making-bitcoin-legal.pdf) argues that the application of the "last-in, first out" principle in *Clayton's case* (*Devaynes v Noble* (1816) 1 Mer 572, 35 E.R. 781) makes digital assets such as Bitcoin readily identifiable and traceable, and so not "fungible". "People who have been doing research on financial anonymity without paying attention to Clayton's case have simply been using the wrong metric. Efficient coin tracing may damage the fungibility of bitcoin. A commodity is called fungible if one unit can replace another; examples are gold coins, and ears of corn. Technology has in the past reduced fungibility. If ten sheep wandered in Roman times from Marcus's field into Pliny's, then the court would let Marcus take any ten of Pliny's sheep; but today, all sheep have electronic tags, so Marcus can get the right sheep back. So too with bitcoin".

[60]    See *Goode on Legal Problems* at para [6-19].

[61]    [1994] 1 WLR 452: followed in *Re Harvard Securities* [1997] 2 BCLC 369; *Re C A Pacific Finance Ltd* [2000] 1 BCLC 494; and *White v Shortall* [2006] NSWSC 1379. See also S. Worthington, 'Sorting out ownership interests in a bulk: gifts, sales and trusts' (1999) JBL 1; P. Parkinson, 'Reconceptualising the Express Trust' (2002) 61 CLJ. 657; A. Dilnot and L. Harris, 'Ownership of a fund' [2012] JIBFL 272. "The argument running through the cases is that if there is a clear intention to declare a trust, there is no reason not to permit such a trust since whenever identification becomes relevant, it is possible to identify the relevant interest. The interchangeability of the shares means that the trustee's obligations can always be fulfilled, without it being necessary to identify separate shares while they are held on trust"; *Goode on Legal Problems* at [6-19].

total shares (i.e. 50 shares) on trust for B. The Court of Appeal held that, although no particular shares had been identified or allocated, there was nevertheless a valid trust.

> **.. Just as a person can give, by will, a specified number of his shares of a certain class in a certain company, so equally, in my judgment, he can declare himself trustee of 50 of his ordinary shares … that is effective to give a beneficial proprietary interest to the beneficiary under the trust ..**[62]

47.   *Hunter v Moss* was considered by Briggs J in *Re LBIE, Pearson v Lehman Brothers Finance SA*[63], where he held (inter alia) that there was sufficient certainty of subject matter for a valid trust, even though the securities were held by the intermediary (LBIE) in a pooled account for clients (on the facts, other Lehman companies, 'affiliates') and subject to a right of use in LBIE's favour.

48.   Of the decision in *Hunter v Moss*, Briggs J said this[64]:

> **.. The difficulty with applying the Court of Appeal's judgment in *Hunter v. Moss* to any case not on almost identical facts lies in the absence of any clearly expressed rationale as to how such a trust works in practice. There has not been unanimity among those courts which have followed *Hunter v Moss*, nor among the many academics who have commented upon it, as to the correct approach.**

> **The analysis which I have found the most persuasive is that such a trust works by creating a beneficial co-ownership share in the identified fund, rather than in the conceptually much more difficult notion of seeking to identify a particular part of that fund which the beneficiary owns outright ..**

49.   This analysis was, in turn applied by Gloster LJ in *Wilkinson v North*[65], where she observed that:

> **.. In terms of certainty of subject, I do not see a difficulty in a trust of a share of an indivisible asset, such as real property, intellectual property rights or book debts. Having regard to *Hunter v Moss* and *the Lehman Bros* case, there would not be an obstacle to a trust of an undivided share of a holding of securities or of a credit balance on a bank account ..**

50.   Hildyard J put the point more succinctly in the 2019 case of *SL Claimants v Tesco Plc*[66] (in the context of the intermediated holding of shares), as follows:

> **.. These omnibus accounts are segregated from the custodian's own assets and the client has the right to call for the delivery up of the legal title to**

---

[62]   At 459, per Dillon LJ
[63]   Fn 56 above.
[64]   At [232]
[65]   [2018] EWCA Civ 161, [2018] 4 WLR 41 at
[66]   [2019] EWHC 2858 (Ch), [2020] Bus LR 250 at [18].

the securities to it or its order. **The legal analysis apparent from the case law is that where the intermediary holds the securities for its account holders in a common pool the individual investor is co-owner in equity with other investors**: see the Financial Markets Law Committee, *Property Interests in Investment Securities* (2004) at para 6.1(4); also *Hunter v Moss* [1994] 1 WLR 452 ..

51.    As the *Law Commission Consultation* has rightly noted, "The relevant case law is not entirely clear and is open to differing interpretations"[67]. However, in the Law Commission's view[68], this line of authorities is readily applicable to the holding of digital securities in pooled or "omnibus" accounts, and that accordingly:

> .. under the law of England and Wales, the current position with regard to omnibus accounts of intermediated crypto-tokens would be as follows.
>
> (1) A valid trust can be established by characterising the claims of users represented by internal account balances for a particular crypto-token as constituting beneficial co-ownership rights. The co-ownership rights would be held by users as equitable tenants in common. They would constitute proportional entitlements to the entire, undivided quantity of that crypto-token entitlement retained at, and identifiable by reference to, specified network addresses or higher-tier intermediary accounts by the custodian on trust for those users.
>
> (2) Beneficial co-ownership rights under a trust are capable of applying to consolidated balances of crypto-tokens that can properly be regarded as fungible. These are asset balances that can be broken down into distinct items of property, which are indistinguishable from each other and are capable of being treated as fully interchangeable units of equal value and validity in the settlement of transactions. In addition, beneficial co-ownership rights can apply to crypto-tokens where the entire token set should more properly be regarded as an undistinguishable and inseparable single asset, such as a tokenised class of company shares or a tokenised debt issuance. A custodian's internal ledger entries representing fractional entitlements to one indivisible NFT held by it on behalf of, and to facilitate trading among, its account holders can also be characterised and structured as beneficial co-ownership interests under an equitable tenancy in common.
>
> (3) It will likely be more straightforward for the courts to recognise equitable coownership rights to collective, unallocated crypto-token entitlements, when they are held on behalf of, or in connection with, user claims only, and are separate and segregated from "house" entitlements that the custodian holds for its own benefit. However, it is important to note that operational segregation by itself is not

---

[67]    At [16.69].  For an account of the academic debate, see eg Ronald Wai, 'In praise of *Hunter v Moss* – "Not 'Turmoil' At All'" (2022) 28 Trusts and Trustees 744.

[68]    At [16-69].

**necessarily sufficient to establish a trust if it cannot be objectively demonstrated that this would be consistent with the intentions of the parties involved. On the other hand, commingling of user and house claims to the same unallocated crypto-token entitlement can still be consistent with a grant of equitable co-ownership rights to users. In such a scenario, there would need to be clear evidence that the custodian holds the entitlement on trust for itself and the users of its platform.**

52.  In my view, an English court would be likely to hold that that passage from the *Law Commission Consultation* accurately sets out the present state of the law.   Each of the three certainties for the creation of a valid trust would therefore seem to be satisfied in the present case, on the facts as they have so far been presented to me.

53.  In coming to that conclusion, I have of course taken into account the recent cases of *Wang v Darby*[69] and *Piroozzadeh v Persons Unknown*[70], in which on the facts of those cases the courts have declined to find the existence of a trust of the digital assets in issue.

54.  In *Wang*, Stephen Houseman QC (sitting as a deputy High Court judge) held that contracts under which two parties had agreed to exchange specified quantities of cryptocurrencies on terms that there would be reciprocal restoration of the same amounts of each currency after two years were sale and buy-back contracts and did not create either an express trust, a *Quistclose* resulting trust[71] or a constructive trust over the exchanged cryptocurrency.

*55.*  *Wang* was a case involving very different facts and was decided on its facts, the judge observing that[72]:

> **.. The fundamental problem with the existence or imposition of any kind of trust .. is the essential economic reciprocity of the transactions, as described above. In order for Mr Wang to become entitled to the return of the 400,000 Tezos, assuming identification were possible or guaranteed for such purposes, he had to return corresponding value in (or equivalent to) Bitcoins to Mr Darby so as to reverse the swap. Whether or not this is characterised as a sale and re-purchase, still less a repo transaction, may not ultimately matter for present purposes. It is the essential economic reciprocity that precludes any trust, in my judgment.**

---

[69]  [2021] EWHC 3054 (Comm) | [2022] Bus LR 121.

[70]  [2023] EWHC 1024 (Ch)

[71]  In "*Quistclose*-resulting trusts (*Quistclose Investments Ltd v Rolls Razor Ltd* [1970] AC 567 .. [t]he touchstone, as always, is objective intention —specifically, that the relevant money should not become part of the general assets of the recipient but should be used exclusively to effect certain payments only. Where such trust arises, the beneficial interest in the transferred money remains in the transferor/payor (beneficiary) who mandates the transferee/payee (trustee) to apply the money paid for a particular purpose which is identifiable with sufficient certainty": ibid at [57]..

[72]  At [78]

It was nevertheless:

> **.. common ground that fungible and nonidentifiable digital assets such as Tezos constitute property that is capable of being bought and sold as well as held on trust as a matter of English law ..**[73]

56.   In *Piroozzadeh* the claimants asserted that they had been deceived into transferring Tether into cryptocurrency wallets controlled by the third defendant, and that it was possible to trace that Tether into wallets held with the eighth and the ninth defendant exchanges. These were deposit wallets or addresses used by the exchanges' own account holders identified only by number.  It was not suggested that those account holders were in any way parties to the original fraud, and the wallets had largely been emptied by the time that the injunction was served.

57.   Again, the facts of *Piroozzadeh* were very far from the present. It was the uncontradicted evidence of the exchanges (primarily Binance) that, under their particular method of operation,

> **.. The user does not retain any property in the Tether deposited with the exchange… [T]he user's account is credited with the amount of the deposit and they are then permitted to draw against any credit balance as in a conventional banking arrangement. The Tether, like other crypto assets, are then swept into a central unsegregated pool address known as a "hot wallet" where they are treated as part of the [exchange's] general assets. They are not specifically segregated to be held for the sole benefit of the user from whose account they have been transferred ..**[74]

58.   The court refused the claimant's application for the continuance of the interim injunction that had been granted against the exchanges, on the basis that the claimants, when applying without notice for the grant of the injunction, had failed to comply with their duty to make full and frank disclosure to the court.   The judge (Trower J) expressly declined finally to decide whether the claimant had any arguable case against the exchanges.   He did, however, observe that "the claimant can garner no support for thinking that his claim against [the exchanges] has any real substance"[75], at least in part because of the exchanges' arguments (a) that they and/or their clients were bona fide purchasers for value of the Tether, thus defeating the claimant's equitable claims to it[76] and/or (b) that the relevant assets had ceased to exist in traceable form.

59.   Neither of these cases therefore seems to me to undermine in any way the conclusions which I have expressed above.   They were cases on very different facts from the present.

---

[73]   At [55]
[74]   At [8].
[75]   At [42]
[76]   At [26].  See *Akers v Samba Financial Group* [2017] UKSC 6 [2017] AC 424 at [83], per Lord Sumption JSC.

Although in both cases the court declined to find the existence of a trust, the judgments cast no doubt on the legal principles which I have discussed and sought to apply.

**(E)    Conclusion**

60.    On the basis of the information presently available to me, my answer to the question in paragraph 3 above:

> **Having regard to the Terms, what proprietary rights (if any) were possessed (a) by Mirana and (b) by FTX in relation to any relevant assets deposited, held, received and/or acquired on the FTX Platform.**

is therefore that, in my opinion, an English Court would be likely to hold that the digital assets in Mirana's Account with FTX were held by FTX on trust for Mirana. Mirana was the beneficial owner of those assets.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 7th, 2024

**Richard Salter KC**
**3 Verulam Buildings**
**Gray's Inn**
**London WC1R 5NT**
**United Kingdom**

22